0029c

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NICHOLAS A. PALMIGIANO, et al. : C.A. No. 74-0172

v. :

BRUCE G. SUNDLUN, et al. :

THOMAS R. ROSS, et al. : C.A. No. 75-0032

v. :

BRUCE G. SUNDLUN, et al. :

# SETTLEMENT AGREEMENT

## I. INTRODUCTION

This case has had a long and complicated history[1]. After an extended trial in 1977, this Court declared that the entire Rhode Island prison system was unconstitutional and entered an extensive remedial order[2]. During the next fifteen years, there were

[1] See, e.g., the series of decisions variously reported as Palmigiano v. Garrahy or Palmigiano v. DiPrete, 443 F.Supp. 956 (D.R.I. 1977); 448 F.Supp. 659; 466 F.Supp. 732, aff'd, 616 F.2d 598 cert. den., 449 U.S. 839; 599 F.2d 17; 639 F.Supp. 244; 700 F.Supp. 1180 (1988); 710 F.Supp. 875 (1989); aff'd, 887 F.2d 258 (1st Cir. 1989); 737 F.Supp. 1257 (D.R.I. 1990).

[2] Palmigiano v. Garrahy, 443 F.Supp. 956, 986 (D.R.I. 1977).

modifying orders, adjudications of contempt against the defendants (various state officials) and the imposition of sanctions. Most of the problems during those years were related or attributable to overcrowding in the Rhode Island prison system. In every instance, the Court found that the overcrowding had a serious deleterious impact on medical care and environmental health and safety and on numerous occasions, experts supported those findings[3].

On January 10, 1991, Senior United States District Judge, Raymond J. Pettine, who had presided over this case from its inception, conducted a chambers conference with all the parties on the occasion of his transferring the case to United States District Judge Ronald R. Lagueux. At that time, Judge Pettine urged a comprehensive approach to the problems of prison overcrowding and, in a final order, stated: "Now is the time to institute safeguards that will forestall and hopefully prevent a recurrence of the past frustrating, costly and devastating ills."

The parties have had a series of meetings during the past two years and the current defendants, Governor Bruce G. Sundlun and Department of Corrections Director George A. Vose, Jr., have begun a comprehensive approach to the solution of overcrowding problems in Rhode Island's prison system. Among other things, on December 3, 1992, Governor Sundlun signed an Executive Order[4] creating a

[3] See, e.g., Palmigiano v. Garrahy, 639 F.Supp. 244 (D.R.I. 1986).

[4] No. 92-26.

Governor's Commission to Avoid Future Prison Overcrowding and Terminate Federal Court Supervision Over the ACI[5]. This Commission was charged with developing a detailed action plan including legislative and policy initiatives for dealing with the state's prison population. The Commission was also directed to consider the creation of a permanent mechanism to maintain the ACI prison population within its capacity on an ongoing basis.

On February 15, 1993, the Commission issued a detailed report together with recommended changes in the Rhode Island criminal justice system and recommended legislation. The Rhode Island General Assembly, thereafter, enacted legislation providing for intermediate sanctions, and a Criminal Justice Oversight Committee.[6]

---

[5] The "ACI," or Adult Correctional Institutions, is the common term for the entire Rhode Island prison system.

[6] Title 12, Chap. 19, Sec. 23.1 et seq. of the General Laws of the State of Rhode Island provides for a wide range of intermediate punishments.

The second bill adopted by the legislature, Title 42, Chap. 26, Sec. 13 et seq., creates a criminal justice oversight committee responsible for coordinating policies of the components of the criminal justice system to control overcrowding in times of crisis. The committee would set annual goals, monitor developments quarterly, especially those related to potential overcrowding, and urge the adoption of appropriate and statutorily authorized steps to reduce overcrowding in a time of crisis.

The parties believe that these recent initiatives by the defendants and other state officials are consistent with important principles of federalism, create the potential for establishing the ACI as a constitutional prison system, and may result in completely restoring authority over a constitutional state prison system where it belongs, in the hands of responsible state officials.

The defendants have recently discontinued the use of the Special Needs Facility (also known as Old Medium Security) as a secure facility, and may plan to convert that facility into a reintegration facility, a facility designed to house a variety of prisoners and programs within the defendants' framework of intermediate sanctions.

Because the parties are interested in resolving plaintiffs' concerns about areas of possible non-compliance, in addressing proposals that defendants might have for modification of existing orders, and in addressing the ultimate termination of compliance monitoring and the Court's active supervision of the remedial orders in this cause, the parties hereby enter into this Settlement Agreement on this 18th day of March, 1994.

## II. DEFINITIONS

A. "Adequate Programming" shall mean the level of programming being provided at the time of the notification of substantial compliance by the Monitors as provided for hereafter.

B. "Decrees" shall mean the Order of the Court entered on August 10, 1977, Palmigiano v. Garrahy, 443 F.Supp. 956 (D.R.I. 1977) and all subsequent Orders in this case governing conditions or practices at the ACI.

C. "Defendants" shall mean the Governor of the State of Rhode Island and the Director the Department of Corrections.

D. "Defendants' Counsel" shall mean the Attorney General for the State of Rhode Island or his designee, the Executive Counsel to the Governor of the State of Rhode Island or her designee, and Chief Legal Counsel to the Department of Corrections or his designee.

E. "Double-celling" shall mean the placement of two prisoners in a cell.

F. "Existing Facilities" or "Facilities" shall mean the following facilities housing members of the plaintiff class which are in existence on the effective date of this Settlement Agreement. They are as follows:

Medium Security Facility (MED)
Special Needs Facility (SNF)
Women's Jonathan Arnold (Womens)
Intake Service Center South (ISC SO)
Intake Service Center North (ISC NO)
High Security Center (HSC)
Maximum Security Facility (MAX)

It is understood that some members of the plaintiff class are housed in ACI facilities not listed above. Those facilities are the Minimum Security Facility, the Work Release Facility (Bernadette Building) and the Women's Work Release Facility (Dix Building). Although those latter facilities are included in the various remedial orders of the Court, they have not been the subject of population overcrowding concern.

G. "Newly Constructed Facility" shall mean any facility housing members of the plaintiffs' class that is completed after the effective date of this Settlement Agreement and shall include additions to an existing facility.

H. "Plaintiffs" shall mean prisoners housed at the Adult Correctional Institutions.

I. "Plaintiffs' Counsel" shall mean Alvin Bronstein and Mark Lopez and other lawyers employed by the National Prison Project of the American Civil Liberties Union Foundation, 1875 Connecticut Avenuue, NW, Ste. 410, Washington, D.C. 20009.

J. "Substantial Compliance" shall mean that the defendants have generally fulfilled the remedial provisions of the August 10, 1977 Order, as amended, and all subsequent orders of this Court, governing the delivery of medical, dental and mental health services; environmental health and safety conditions and practices; and, management, security and inmate activity issues. In the event that achieving substantial compliance requires the defendants to make any capital improvements, alterations, or renovations, they may achieve substantial compliance in the following manner. The defendants shall prepare and submit to plaintiffs' counsel a written document which sets forth in detail a plan for the improvement, alteration, or renovation, the amount of funds required, the source of those funds, and a specific timetable for completing the work. If counsel for plaintiffs approve of the foregoing plans in writing, the defendants shall be entitled to a finding of substantial

compliance from the date of such written approval rather than the actual completion of the capital improvement, alteration, or renovation. Plaintiffs shall not unreasonably withhold approval.

III. RESTRICTIONS ON OVERCROWDING

A. Areas not designed and built for housing prisoners shall not be utilized for the housing of prisoners. For example, prisoners shall not be housed in corridors, hallways, dayrooms, program space, office space, recreation space or general purpose space.

B. Except as provided in Paragraph C of this Section III, defendants agree that they will not assign more than one person to a cell in existing facilities. Defendants may assign two prisoners to a cell in newly constructed facilities provided that the prisoners are not classified as maximum security; that such cells shall adhere to the space requirements as set forth in the American Correctional Association standards in effect at the time of execution of this Agreement[7]; and such cells allow prisoners direct access to toilet and hand washing facilities without assistance from a staff member.

[7] The reference in text is to the American Correctional Association Standard 3-4128 (1991) and 3-4128-1 (1994), copies are attached to the Agreement as Appendix A.

C. 1. Defendants shall be permitted to double-cell some prisoners in HSC, Medium, ISC NO and ISC SO, as detailed in Paragraph D of this Section III, provided that the specific conditions set forth in Paragraph D are met. Units designated as protective custody units in those four facilities may be double celled.

2. Defendants shall ensure that sound classification practice and principle are followed before deciding to double-cell any particular prisoner.

D. The designated maximum population capacities for the following respective housing areas shall not be exceeded, except in the event of an emergency as set forth in Paragraph G.

| | | | |
|---|---|---|---|
| 1. | Facility: | Medium | |
| | Capacity: | 288 Cells Double Bunked | 576 |
| | | 288 Cells Single Bunked | 288 |
| | | 24 Segregation Cells Single Bunked | 24 |
| | | 4 Medical Cells | 4 |
| | | 6 Medical Ward | 6 |
| | TOTAL: | | 898 |

The double-celling in this facility is conditioned upon the installation of Two Hundred, Eighty-Eight (288) beds to create cells adaptable to double-celling. Such cells shall be divided proportionally among the six (6) regular housing units and double-celling is contingent upon each prisoner being adequately programmed and being allowed ten (10) hours out of cell time daily.

2. Facility: SNF (Only if used as a secure facility)

| | | |
|---|---|---|
| Capacity: | A, B, C Dorms with 54 Inmates Each | 162 |
| | D Dorm | 32 |
| | A Honor Dorm | 20 |
| | Cell Block CBS | 20 |
| | Cell Block DCB | 16 |
| TOTAL: | | 250 |

The population capacities above are conditioned upon the defendants completing renovations to the following: D Dorm toilets; additional showers in Dorms A, B and C; toilets and showers in A honor dorm, all as called for in Special Needs Facility Recommendations (Powitz Report of 3/12/92)[8]. If F Dorm is constructed, capacity can be increased to Three Hundred and Four (304) (Fifty-four (54) inmates in F Dorm); if adequate toilet facilities and ventilation are installed in E Dorm, capacity can be further increased to Three Hundred and Twenty-Four (324) (Twenty (20) inmates in E Dorm).

3. Facility: Womens

| | | |
|---|---|---|
| Capacity: | Beds | 106 |
| | Segregation Cells | 4 |
| TOTAL: | | 110 |

If exhaust fans are installed and toilet areas are repaired as called for in Women's Division Recommendations #2 and #3 (Powitz Report of 3/12/92) the capacity may be increased to One Hundred and Twenty-Five (125).

[8] All references to Powitz Report are to a report and recommendations made by Robert Powitz, the defendants' environmental health expert. The report dated March 12, 1992, is attached hereto as Appendix B.

| | | | |
|---|---|---|---|
| 4. | Facility: | ISC South | |
| | Capacity: | 72 Cells Double Bunked | 144 |
| | | 72 Cells Single Bunked | 72 |
| | | 24 Segregation Cells Single Bunked | 24 |
| | | 8 Medical Cells | 8 |
| | | 10 Bed Medical Ward | 10 |
| | TOTAL: | | 258 |

The population capacities above are contingent upon the following:

a) limiting the use of this facility to confine pretrial detainees, and convicted prisoners but only for maximum of One Hundred, Twenty (120) days after sentencing (except for protective-custody prisoners permanently assigned to ISC). Pretrial detainees shall be separated from convicted prisoners;

b) double-celling only up to Fifty percent (50%) of the cells in each module:

c) each prisoner except those identified in Section III D(4)(d) (as stated below), shall be allowed Six and a Quarter (6.25) hours out of cell time daily;

d) each protective custody prisoner who is sentenced and classified shall be allowed ten (10) hours out of cell time daily;

e) implementation of upgrade corrections to ventilation system as called for in ISC South Recommendations #1 and #4 (Powitz Report of 3/12/92). If these contingencies are not complied with, all cells must be single occupancy for a total capacity of One Hundred and Sixty-Eight (168) (exclusive of medical beds).

5. Facility: ISC North
Capacity: 392 Cells Double Bunked 784
TOTAL: 784

The population capacities above are contingent upon the following:

a) limiting the use of this facility to confine pretrial detainees, and convicted prisoners but only for maximum of One Hundred and Twenty (120) days after sentencing (except for protective-custody prisoners permanently assigned to ISC). Pretrial detainees shall be separated from convicted prisoners;

b) each prisoner, except those identified in Section III, D(5)(c) (as stated below), shall be allowed Six and a Quarter (6.25) hours out of cell time daily;

c) each protective custody prisoner who is sentenced and classified shall be allowed ten (10) hours out of cell time daily.

6. Facility: HSC
Capacity:

| | |
|---|---|
| 48 Cells Double Bunked | 96 |
| 24 Cells Single Bunked | 24 |
| 24 Segregation Cells Single Bunked | 24 |
| 4 Psychiatric Cells | 4 |
| 8 Bed Hospital Ward | 8 |
| TOTAL: | 156 |

The double-celling in this facility is limited to protective custody prisoners and conditioned upon the installation of forty-eight (48) beds to create cells adaptable to double-celling. Each prisoner being double-celled shall be adequately programmed and allowed ten (10) hours out of cell time daily. Under no circumstances shall maximum custody prisoners be double celled at this facility, except those housed in the protective custody unit.

| | | | |
|---|---|---|---|
| 7. | Facility: | Maximum | |
| | Capacity: | Cells Single Bunked | 411 |
| | | Segregation Cells Single Bunked | 39 |
| | | Bed Medical Ward | 16 |
| | TOTAL: | | 466 |

If the ten (10) rear cells are renovated to contain sufficient natural light and ventilation to meet APHA Standards[9] in effect at the time of execution of this Agreement, capacity can be increased to Four Hundred and Seventy Six (476) inmates.

E. Dormitories used for the housing of prisoners shall provide each occupant with at least twenty-five (25) square feet of unencumbered floor space. This space requirement shall not include space encumbered by a bed or locker nor shall it include any available program space or dayroom space. These limitations shall

[9] Standards of the American Public Health Association.

not apply to newly constructed minimum security and work release facilities and newly constructed minimum security and work release facilities would be subject to the American Correctional Association Standards in effect at the time of execution of this Agreement. A copy of those standards are set forth in Appendix A.

F. In entering into this Settlement Agreement, the parties acknowledge that the safety and security of prisoners and staff are a matter of mutual concern. The parties further acknowledge that certain conditions and eventualities are within the contemplation of the parties. These include the possibility that the Rhode Island jail and prison system may experience a substantial increase or decrease in its population; that the rate of crime or conviction within the State of Rhode Island may continue at its current rate or increase or decrease substantially; that the incidence of parole may increase or decrease substantially; that the cost of construction of new facilities or renovation of existing facilities may increase or decrease substantially; that substantial difficulty may or may not be encountered by the Rhode Island Department of Corrections in attracting and employing security and non-security staff; and that substantial construction delays may or may not occur with respect to the renovation of existing units or the construction of new facilities, units or additions thereto. A condition or eventuality within the contemplation of the parties does not constitute a changed circumstance.

G. Paragraphs A through E inclusive of Section III shall be enforceable in any federal or state court of competent jurisdiction. The defendants shall comply with the population capacities set forth in Section III of this Settlement Agreement except in the following circumstances:

1. Any provision establishing population capacity or limits may be suspended, even in the absence of an emergency, if the suspension is temporarily necessary because of actions by members of the plaintiff class or if suspensions are sporadic or isolated in nature, provided that the suspension lasts no longer than five (5) consecutive days. Any such suspension, including the reason therefore, shall be reported to counsel for plaintiffs as promptly as is reasonably possible following the commencement of the suspension.

2. a) In the event of an emergency that makes substantial compliance with any of the terms of this Settlement Agreement impossible, extraordinarily difficult or unfeasible, it may be necessary to suspend temporarily, even beyond five (5) consecutive days, any provision that establishes population limits of this Settlement Agreement. In such event, the Director of the Rhode Island Department of Corrections shall formally declare a state of emergency, and, as soon as practical but no later than five days after such

declaration, notify counsel for plaintiffs of the reasons that justified the suspension of any provision that establishes population limits of this Settlement Agreement. The defendants shall also notify counsel for plaintiffs of the expected duration of the suspension and the plan of the defendants to restore full operation of the Settlement Agreement.

b) For purposes of this Settlement Agreement, an emergency is defined as a circumstance caused by a riot, fire, hurricane or similar event not caused intentionally by the defendants, their agents, or employees, that makes substantial compliance with the provisions that establish population limits of this Settlement Agreement temporarily impossible, extraordinarily difficult or unfeasible. Construction delays or labor disputes not caused intentionally or reasonably anticipated by the defendants may constitute an emergency, but legislative, executive, or administrative policy decisions not to appropriate funds or allocate resources to the housing of prisoners shall not justify the declaration of an emergency. In addition, legislative or judicial decisions regarding sentencing shall not justify the declaration of an emergency.

c) In the event that the defendants seek to continue emergency suspension of any provision that establishes population limits of this Settlement Agreement for a period of time greater than ninety (90) days without the agreement of plaintiffs' counsel, the defendants may seek the Court's permission to suspend any provision that establishes population limits of this Settlement Agreement. In any such motion, the defendants bear the burden of persuasion.

3. If the plaintiffs' counsel believe that any suspension of any provision of this Settlement Agreement that establishes population limits or the duration of the suspension is unjustified, unreasonable, or taken in bad faith, they may request appropriate relief from the Court. In such event, the plaintiffs bear the burden of persuasion.

## IV. MEDICAL MENTAL HEALTH AND DENTAL CARE

The defendants shall at all times maintain an adequate and constitutional system of medical, dental and mental health care. They shall employ sufficient staff to maintain a primary care system with a focus on preventive health care, health maintenance and prospective management of chronic disease.

V. ENVIRONMENTAL HEALTH AND SAFETY

The defendants shall at all times maintain environmental health and safety practices and conditions that are adequate and constitutional.

VI. MANAGEMENT, SECURITY AND INMATE ACTIVITY

The defendants shall at all times engage in practices and maintain conditions regarding management, security and inmate activity that are adequate and constitutional.

VII. INDEPENDENT MONITORS

A. The parties hereby designate Dr. Lambert King and Robert Powitz as independent monitors (Monitors) to observe and report upon substantial compliance with the terms of this Settlement Agreement. These Monitors are experts in the areas of medical care, environmental health, and fire safety. The Monitors shall observe and assess substantial compliance with the terms of this Settlement Agreement, report to the parties about such substantial compliance, and give advice and recommendations to the parties.

B. In carrying out their duties, consistent with legitimate requirements of security, the Monitors shall have the following:

1. unobstructed access to staff, inmates or other knowledgeable persons for interviews or written communication regarding conditions at the facilities covered by this Settlement Agreement. Such interviews or other communication may be held in private, and may be held in confidence by the Monitors. At their discretion, the Monitors may divulge the content or nature of such interviews or communications to the Director of the Department of Corrections and to counsel for the plaintiffs and defendants;

2. complete and unobstructed access to relevant files, records, reports, memoranda or other documents within the defendants' possession or custody for purposes of measuring substantial compliance with the terms of this Settlement Agreement;

3. unobstructed access to tour and inspect the institutions.

C. The Monitors shall not be subject to dismissal except upon agreement of all parties or by the Court upon motion of one of the parties and upon a showing of good cause.

D. The reasonable costs of the Monitors shall be borne by the Department of Corrections.

E. In the event that either Dr. Lambert King and/or Robert Powitz resign, become incapacitated, or for any other reason cannot perform their duties, the parties will mutually select a substitute Monitor or Monitors.

## VIII. MONITORING AND COMPLIANCE

A. In no event shall a determination of substantial compliance be made if exceptions to substantial compliance are the result of willful or intentional actions by defendants.

B. 1. Commencing on or about March 18, 1994, the Monitors shall conduct periodic inspections and prepare reports detailing the state of defendants' substantial compliance with the provisions of this Settlement Agreement. The Monitors shall complete their initial inspections and prepare their initial reports within three months of their appointment. In the event that the three (3) month period is unfeasible due to scheduling problems, the time period for the Monitors to submit their reports may be extended by the agreement of the parties, but in no condition shall it be extended beyond six (6) months.

2. The periodic inspections of the Monitors shall continue until they notify defendants' counsel and plaintiffs' counsel that the defendants are in substantial compliance as defined in this Settlement Agreement.

C. Counsel for the plaintiffs will review the state of substantial compliance under Section VI, Management, Security and Inmate Activity within three months of signing this Settlement Agreement, and resolve any compliance issues in these areas directly with the defendants.

D. Incidents of non-compliance do not necessarily prevent a finding of substantial compliance. The determination of substantial compliance shall take into account the extent to which exceptions to substantial compliance are sporadic or isolated in nature, are unintentional, are the temporary result of actions by the members of the plaintiff class and are promptly and properly addressed by corrective action.

E. This Settlement Agreement shall be submitted to the Court for its review and approval pursuant to Rule 23 of the Federal Rules of Civil Procedure. The parties shall recommend to the Court a method of complying with the notice provisions of Rule 23(d) and (e).

F. 1. The parties shall have the opportunity to challenge the determinations of the Monitors, pursuant to Section VIII, Paragraph B of this Settlement Agreement, and plaintiffs' counsel, pursuant to Section VIII, Paragraph C of this Settlement Agreement. The Court shall establish a procedure, if necessary, by which any hearing on that issue shall be conducted.

2. Upon review of the evidence, the Court will make a determination whether the defendants are in substantial compliance.

G. Upon receipt of the Monitors' reports of substantial compliance, the defendants shall file with the Court a motion to dismiss this lawsuit and dissolve any outstanding orders in Palmigiano v. Sundlun, except the provisions of Section III of this Settlement Agreement (Overcrowding Restrictions).

H. 1. For the first four months following the Court's approval of a determination of substantial compliance, as set forth above, the defendants shall forward to plaintiffs' counsel monthly reports and supporting documentation detailing the status of defendants' compliance with Sections III, IV, V, VI of the Settlement Agreement. The Director of the Department of Corrections shall serve on plaintiffs' counsel a certificate attesting that the contents of the reports are true and correct, and that the documents submitted in support of them are true and accurate copies of defendants' documents maintained in the ordinary course of operations of the Department.

2. The first such report shall be served on plaintiffs' counsel one (1) month from the date of the Court's approval of the substantial compliance determination.

3. The obligation to file monthly reports under this section of the Settlement Agreement shall conclude four months after the date on which the Court approves a determination of substantial compliance.

4. Counsel for the plaintiff class shall be afforded sufficient access to the institutions and to the plaintiffs to determine the accuracy of the representations contained in the reports served by defendants.

I. At the end of the four (4) month period set forth in Section VIII, Paragraph H and provided that the defendants demonstrate continuing substantial compliance, the parties, without

further recourse to judicial proceeding, including appellate review, shall execute and file a stipulation dismissing this lawsuit and dissolving any outstanding orders in Palmigiano v. Sundlun, except the provisions of Section III of this Settlement Agreement (Overcrowding Restrictions). The provisions of Section III of this Agreement shall survive the aforesaid dismissal and continue to be enforceable in accordance with the provisions of Section III, Paragraph G.

J. Nothing stated herein shall prevent plaintiffs from moving the Court for additional relief or further relief based upon a claim of non-compliance, including a failure to file appropriate monthly compliance reports and supporting documentation.

## IX. PERMANENT STATE PRISON OVERCROWDING CONTROL MECHANISM

A. One of the stated purposes of Executive Order No. 92-26 creating the Governor's Commission to Avoid Future Prison Overcrowding was to terminate federal court supervision over the ACI by having the Commission consider "the creation of a permanent body the purpose of which shall be to maintain the prison population within capacity on and ongoing basis."

B. The State of Rhode Island has created a permanent agency, body, commission or other mechanism (hereafter "State Mechanism") with the authority and power to control prison overcrowding. Accordingly, the parties agree that this case, specifically the

provisions of Section III (Overcrowding Restrictions), shall be retired and placed on inactive status in this Court provided that the following conditions are met:

1. The State Mechanism shall adopt the specific population capacities and restrictions set forth in Section III of this agreement as its own capacities and restrictions.

2. The State Mechanism shall have the authority and power under state law to enforce the aforesaid population capacities and restrictions effectively.

C. 1. The Department of Corrections shall provide to plaintiffs counsel a quarterly report, in the format of the current "ACI Daily Population Report" form, detailing the actual population of each unit of each facility in the ACI on the last day of the quarter for a period of five (5) years after the Court enters the dismissal order, referred to in Section VIII, I, above. [10]

2. Each report shall include a signed certification by the Director of the Department of Corrections attesting to the fact that the aforesaid population capacities and restrictions are being adhered to.

---

[10] This 5-year limitation shall only apply to the defendants' obligation to provide quarterly population reports. It does not apply to the defendants' obligation to maintain the population capacities and restrictions referred to in Section III of the Settlement Agreement.

3. Plaintiffs waive any attorneys' fees and costs incurred by them for reviewing these quarterly reports, pursuant to Section IX, Paragraph C of this Settlement Agreement. No other fees or costs are waived in this agreement.

D. In the event that the population of any facility in the ACI exceeds the capacity limits of Section III for five (5) consecutive days in a non-emergency situation (Section III, Paragraph G), the Director shall notify plaintiffs' counsel of that fact in writing.

E. If the requirements and conditions set forth above in Section IX, paragraphs A and B are being fully observed and the State Mechanism exercises its authority and power to enforce the population capacities and restrictions effectively, the provisions of Section III of this Settlement Agreement shall not be enforceable in this Court and plaintiffs agree not to bring any action or proceeding to enforce said provisions.

F. In the event that the State Mechanism is disbanded or discontinued, or loses its authority and power to enforce the aforesaid population capacities and restrictions effectively, or fails to exercise its authority and power to enforce the population capacities and restrictions effectively, the provisions of paragraph E of this Section shall be null and void and plaintiffs shall have the right to seek enforcement of the provisions of Section III.

3. Plaintiffs waive any attorneys' fees and costs incurred by them for reviewing these quarterly reports, pursuant to Section IX, Paragraph C of this Settlement Agreement. No other fees or costs are waived in this agreement.

D. In the event that the population of any facility in the ACI exceeds the capacity limits of Section III for five (5) consecutive days in a non-emergency situation (Section III, Paragraph G), the Director shall notify plaintiffs' counsel of that fact in writing.

E. If the requirements and conditions set forth above in Section IX, paragraphs A and B are being fully observed and the State Mechanism exercises its authority and power to enforce the population capacities and restrictions effectively, the provisions of Section III of this Settlement Agreement shall not be enforceable in this Court and plaintiffs agree not to bring any action or proceeding to enforce said provisions.

F. In the event that the State Mechanism is disbanded or discontinued, or loses its authority and power to enforce the aforesaid population capacities and restrictions effectively, or fails to exercise its authority and power to enforce the population capacities and restrictions effectively, the provisions of paragraph E of this Section shall be null and void and plaintiffs shall have the right to seek enforcement of the provisions of Section III.

entirety by the Court then this Settlement Agreement and the Orders of the Court constitute the entire agreement of the plaintiffs and defendants.

2. If this Settlement Agreement is not approved in its entirety by the Court, then this Settlement Agreement shall be null and void.

F. This Settlement Agreement is a document which all parties have negotiated and drafted. Since all parties participated equally in drafting its terms, the general rule of construction interpreting a document against the drafter shall not be applied in future interpretation of this Settlement Agreement.

G. The Settlement Agreement shall be effective on the date of its execution.

On Behalf of Plaintiffs

Alvin J. Bronstein, Esq.
Mark Lopez, Esq.
National Prison Project of the American Civil Liberties Union Fdn.
1875 Connecticut Ave, NW, Ste. 410
Washington, D.C. 20009
(202) 234-4830

Date: March 18, 1994

On Behalf of Defendants

Bruce G. Sundlun
Governor, State of Rhode Island
State House
Providence, Rhode Island 02903

George A. Vose, Jr.
Director of the Department of Corrections
State of Rhode Island
40 Howard Avenue
Cranston, Rhode Island 02920
(401) 464-2611

Date: March 18, 1994

Respectfully submited,

Attorneys for Plaintiffs

Alvin J. Bronstein, Esq.
Mark Lopez, Esq.
National Prison Project of the American Civil Liberties Union Fdn.
1875 Connecticut Ave, NW, Ste. 410
Washington, D.C. 20009

Date: March 18, 1994

Attorneys for Defendants

Maureen G. Glynn
Special Assistant Attorney General
Robin E. Feder
Assistant Attorney General
72 Pine Street
Providence, Rhode Island
(401)274-4400 x2301

Elizabeth Murdock Myers
Executive Counsel to the Governor Bruce G. Sundlun
State of Rhode Island
State House
Providence, Rhode Island

Anthony A. Cipriano
Associate Director and Chief Legal Counsel
Ellen Evans Alexander
Deputy Chief Legal Counsel
Department of Corrections
75 Howard Avenue
Cranston, Rhode Island
(401) 464-2246

Date: March 18, 1994