UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NICHOLAS PALMIGIANO, et al.,
Plaintiffs,

v. C.A. No. 74-0172L

BRUCE G. SUNDLUN, Governor of the STATE OF RHODE ISLAND, and GEORGE VOSE, in his capacity as Director, Rhode Island Department of Corrections,[1]
Defendants.

THOMAS R. ROSS, et al.,
Plaintiffs,

v. C.A. No. 75-0032L

BRUCE G. SUNDLUN, Governor of the STATE OF RHODE ISLAND, and GEORGE VOSE, in his capacity as Director, Rhode Island Department of Corrections,
Defendants.

OPINION AND ORDER

This matter is before the Court on the Motions of several inmates currently incarcerated at the Adult Correctional Institutions (the "ACI"), Rhode Island's comprehensive state prison facility. The inmates seek to intervene or join a class action lawsuit, filed in 1974, in order to redress various complaints concerning the present conditions of their incarceration. The original class action litigation,

---

[1] These were the named Defendants when the case was closed in 1995. Presently, Donald Carcieri is Governor and A. T. Wall is Director of the Department of Corrections.

consolidated under the dual heading above, was dismissed in 1995, according to the terms of a 1994 Settlement Agreement. Consequently, as the Court will explain, the present group of inmate petitioners must find another avenue to redress their complaints.

## Background

In 1974 and 1975 five prisoners at the ACI, along with the National Prisoners Reform Association, filed lawsuits alleging that the conditions at the prison were so intolerable that they violated the Eighth Amendment's prohibition against cruel and unusual punishment. Plaintiffs were certified as a class by Judge Raymond Pettine of this Court on July 23, 1976. The Plaintiff Class represented over 650 inmates incarcerated at the ACI, including sentenced prisoners and pre-trial detainees. It was represented by the National Prison Project of the American Civil Liberties Union.

Plaintiffs made four principal claims. Prisoners housed in the Maximum Security and Medium Security facilities complained that they experienced unconstitutional levels of violence and fear of violence. In addition, the conditions of these two facilities were filthy and unsanitary, including the food service areas; medical care was inadequate; and there was no programming for inmates, resulting in almost complete idleness. Pre-trial detainees, who were intermixed with the rest of the population,

were subjected to worse conditions and treatment, including instances of inmate violence that the guards were unable to prevent. Prisoners who sought to evade inmate violence by being placed in protective custody complained that they were subjected to conditions worse than those suffered by the rest of the population, in violation of the equal protection clause of the Fourteenth Amendment.

These matters were litigated during a two-week bench trial in 1977, before Judge Pettine. His opinion and findings of fact may be found at Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I. 1977). To summarize a harrowing, detailed and compelling thirty-nine page opinion, uncontradicted testimony showed that the Maximum facility was filthy, plumbing leaked, sewage was backed up, wiring was faulty, heating was inadequate, and the kitchen area was infested with rats and cockroaches. The Court found that the conditions constituted "an imminent public health, fire, and safety hazard," and that the facilities were "clearly unfit for human habitation according to any criteria used by public health officers or professional corrections personnel." 443 F. Supp. at 964. The conditions in Medium, where the inmates in protective custody were housed in dormitories, were not much better. 443 F. Supp. at 964-965.

Major problems were found with the ACI's process, or lack thereof, of classifying inmates according to their security needs

in order to determine their proper placement in the prison system. These problems were the basis of the complaints brought by pre-trial detainees. Members of this group, including many detainees being held due to their inability to make bail of under $1,000, were housed with violent criminals serving life sentences. There was rampant violence, sexual abuse and drug abuse, with no medical or psychological treatment programs, or even recreational, vocational or rehabilitative programs or activities with which to occupy the inmates. The Court concluded:

> The lack of sanitation, lighting, heating, and ventilation, and the noise, idleness, fear and violence, and the absence or inadequacy of programs of classification, education, physical exercise, vocational training or other constructive activity create a total environment where debilitation is inevitable, and which is unfit for human habitation and shocking to the conscience of a reasonably civilized person. These conditions of confinement serve no legitimate correctional purpose, and are so far beyond the pale of civilized standards that they would be unjustified even if they did serve some such purpose.

443 F. Supp. at 979-980. To remedy these problems, the Court ordered an extensive regimen of changes to be implemented by the Department of Corrections, within specified time frames. The Court also appointed a Special Master to assist in the implementation of the remedies, to monitor compliance and to report to the Court on the progress. The Court retained

jurisdiction of the case.

*Achieving compliance*

The problems were intractable, and the changes ordered by Judge Pettine did not come about swiftly, or according to the Court-ordered schedule. The following year, Judge Pettine found the ACI Defendants in contempt for failing to comply with the portion of the Order concerning the classification of inmates according to security designation. Palmigiano v. Garrahy, 448 F. Supp. 659 (D.R.I. 1978).

In 1982, the newly-constructed Intake Service Center (the "ISC") was opened to provide accommodation for 168 pre-trial detainees, separate from the rest of the prison population. By 1983, the Master reported to the Court that the ISC was housing 250 detainees. In 1984, Governor J. Joseph Garrahy appointed a Task Force on Prison Overcrowding. Only one of its recommendations was adopted by the legislature, which approved a plan to build a new medium security facility.

In 1985, the Master reported that detainees were sleeping three to a 70 square-foot cell at the ISC. Detainees stayed in those cells for 20 hours a day, and many were required to eat their meals in their cell. All the new facility's systems were sorely overtaxed by the burgeoning population.

In 1986, Defendants sought a review of the 1977 Order in light of two new United States Supreme Court cases establishing

proper square footage guidelines for prison cells. Defendants argued that they could not comply with the Court's mandates until the new Medium security facility was built. At Palmigiano v. Garrahy, 639 F. Supp. 244, 258 (D.R.I. 1986), Judge Pettine denied Defendant's request and expressed his frustration at the lack of progress made since his initial Order:

> The record shows that for nine years this Court has employed all the artifices it could conceive to have the defendants cure the many constitutional violations it found. I have been imperious, didactic, and supplicatory; I have cajoled and waited as though for Godot. I have ever been reluctant to interfere with the operation of the prison. However, the pattern is always the same...

The opinion went on to reincorporate portions of the 1977 Order, as well as to set forth new population caps and requirements for medical and mental health programming. 639 F. Supp. at 258-260. These standards were incorporated into a series of Consent Orders in 1987; however, Defendants still failed to bring the prison into compliance.

In 1998, at Palmigiano v. DiPrete, 700 F. Supp. 1180 (D.R.I. 1988), Judge Pettine again found Defendants in contempt for violating three standing orders: the prohibition against housing pre-trial detainees in dormitories; the limitation against double-celling detainees for more than 30 days; and the population cap of no more than 250 detainees at the ISC. Later that year, the state legislature appropriated $16.5 million to

expand the ISC.

The following year, Defendants transferred the use of a building from another state agency in order to house 225 recently-sentenced inmates from the ISC. This cut down the use of dormitories and shortened the length of time that pre-trial detainees were double-celled. At Palmigiano v. DiPrete, 710 F. Supp. 875 (D.R.I. 1989), the Court found, however, that insufficient progress had been made and that Defendants had failed to purge their contempt. The Court began levying fines, with a portion of the money applied to an emergency bail fund for indigent detainees at the ISC.

In 1990, Plaintiffs again moved to hold Defendants in contempt, and Defendants moved to modify the standing orders. Palmigiano v. DiPrete, 737 F. Supp. 1257 (D.R.I. 1990). Citing an ISC population of 553, violence, overcrowding and a myriad of health and fire safety violations, Judge Pettine quoted an expert who had inspected the ACI as stating that conditions at the ISC were "much, much worse, much, much worse." 737 F. Supp. at 1259. The Court again found Defendants in contempt and ordered fourteen remedial measures to be put into effect right away. Id. at 1262-1264. This marked a turning point for Defendants.

In 1991, this writer took responsibility for the matter when

Judge Pettine cut back his caseload as a Senior Judge.[2] In 1992, Governor Bruce Sundlun created the Commission to Avoid Future Prison Overcrowding. By March of that year, a report to the Court indicated that the sanitation expert had inspected the ACI and generally found it to be well-maintained and clean with some improvements in fire safety - although some problems continued, particularly with ventilation.

In 1993, in response to a report issued by the Governor's Commission, the General Assembly enacted two pieces of corrective legislation. Rhode Island Gen. Laws § 12-19-23.2 permitted the State courts to impose sentences other than incarceration for some infractions, and Rhode Island Gen. Laws § 42-26-13, created a permanent Criminal Justice Oversight Committee "for the purpose of maintaining the secure facilities at the adult correctional institutions within their respective capacities as established by court order, consent decree or otherwise." In 1994, this Court approved an uncontested motion to dissolve the emergency bail fund, because the ISC was no longer overcrowded. In addition, use of one of the most deteriorated buildings, the old 'Medium Security' facility was finally discontinued, when another state

---

[2] It is ironic that this writer, as an Associate Justice of the Rhode Island Superior Court, sentenced the lead plaintiff, Nicholas Palmigiano, to life in prison for murder in 1970. Years later he was placed in the Federal Witness Protection Program and given a new identity after giving testimony in a number of cases.

building, known as the Special Needs facility, was dedicated to prison use.

*Settlement Agreement*

In March 1994, following three years of negotiation, the parties entered into a Settlement Agreement. The Agreement provided specific restrictions on inmate population in all areas of the ACI, and emergency procedures for temporary deviations from those caps. The Agreement also provided for ongoing independent monitoring through periodic inspections of the facility until those monitors made a finding of substantial compliance with the terms of the Agreement. Thereafter, the statutory Criminal Justice Oversight Committee was charged with enforcing the population restrictions. After four months of continuing substantial compliance, the parties would, by stipulation, dismiss the lawsuit and dissolve any and all outstanding court orders, with the exception of the population restrictions delineated in the Settlement Agreement.

In June 1994, the Settlement Agreement was approved by this Court. At the hearing on June 30, 1994, Plaintiffs' counsel described the Agreement as "a model for resolving prison litigation throughout the country..." This writer stated,

> The Court at this point is not aware that there are any unconstitutional conditions existing at the ACI at this moment. But this agreement will insure that there are no unconstitutional conditions before this matter is closed out. The settlement

> agreement provides for a reasonable method of concluding this matter by having monitors review all aspects of the conditions at the ACI.

Transcript, p. 10, June 30, 1994, morning session.

On December 7, 1994, this Court entered an Order determining that Defendants were in substantial compliance with the terms of the Settlement Agreement. Six months of self-monitoring by Defendants ensued. In May 1995, the parties stipulated that the cap on the women's prison could be increased to 125 inmates because of physical and environmental improvements implemented at that facility.

*Dismissal of lawsuit*

In July 1995, a Stipulation of Dismissal was approved by this Court. The stipulation provided that Defendants remained in substantial compliance with the terms of the Settlement Agreement, including specific and detailed plans in place for necessary capital improvements and for improving the facility's medical program. The state Criminal Justice Oversight Committee was further charged with adopting and enforcing the population restrictions outlined in the Settlement Agreement, at which point the litigation would be retired and placed on inactive status, and all outstanding decrees dismissed. The Stipulation of Dismissal also required Defendants to provide Plaintiffs with reports on the ACI's population quarterly for five years, and

required Defendants to pay Plaintiffs the attorneys' fees that had been incurred throughout the litigation.

On March 18, 1997, the parties entered into a Stipulation and Order of Settlement to settle all claims for attorneys' fees. This stipulation specified that Plaintiffs released Defendants from all present and future claims for legal fees in connection with the class action litigation.

Since 1995, as improvements to the physical facilities have been completed, the parties have entered into several more stipulations increasing the acceptable population levels. These included improvements and reconfigurations made to the Gloria McDonald women's facility, the ISC, Medium II, and the construction of a new F dormitory, as well as an annex to ISC. In February 2003, double-celling was permitted in the segregation unit of John J. Moran Medium Security, with inmate screening to minimize the risk of danger.

No further activity has taken place in connection with this litigation until the recent spate of inmate motions filed in 2006 and 2007.

## Inmate Motions

The first group of inmate motions were filed in 2006 by Wesley Mello, Eric Jirah (or Jirah Eric) Kelley and Kenneth Day. Jirah Kelley led the charge on July 26, 2006, with an extensive filing including a Request to find Defendants in Civil Contempt

and Non-Compliance for twenty-nine years, a Joinder Motion, Motion for Injunction, Motion for a Protective Order, Motion to Intervene, Motion for Discovery and Amendment of the Complaint. Kelley tells the Court that he has been transferred to the ACI from a maximum security prison in Massachusetts, pursuant to the New England Interstate Agreement, because of problems with his incarceration in Massachusetts. The thrust of his current complaint is his treatment at the ACI, specifically that he was denied psychotropic medication for three days at the time of his transfer, and that while he was experiencing a resultant psychotic episode, he was stripped and placed in a filthy, cold and empty cell, with dried urine and feces on the floor and walls. Kelley alleges further that he was placed in the maximum security unit, although he was classified as a medium security inmate, and that he, and other inmates, are daily victims of excessive force, violence, torture, thievery and punitive segregation placement at the hands of prison officials. Kelley alleges that conditions at the ACI have not improved since the 1977 bench trial: cell temperatures are intolerable; there is no ventilation; there are no fire sprinklers; there is vermin infestation; and inmates have insufficient access to law library resources. Kelley followed up his initial filing with a Reply to the Defendants' memorandum, and a Motion for Summary Judgment, filed on November 20, 2006. This Motion appears to have been

also filed in the U.S. Court of Appeals. Finally, he has filed a Motion to Waive All Remaining Stages of Litigation and Proceed to Trial, on December 1, 2006. In a Statement of Facts attached to this Motion, Kelley states that the ACI is "at a ALL TIME HIGH IN POPULATION OVERCROWDING AND ALL THE VIOLATIONS IN PLAINTIFFS CONTEMPT MOTION ARE GENERATED FOR THE OVERCROWDING AND CONTEMPT."

On September 1, 2006, Kenneth Day filed a Motion for Joinder to join Jirah Kelley in the 1974 lawsuit. In his accompanying affidavit, Day charges that he has been "subjected to various violations of my civil liberties, and further violations resulting from the non-compliance and civil contempt of the defendants (R.I.D.O.C.) and the April 15th, 1994 SETTLEMENT AGREEMENT." His filing also includes a "Good Faith Claim Letter" in which he relates an incident when he accidentally urinated on himself because he was denied the use of a toilet, then punished with 15 days in the segregation unit.

Wesley Mello filed an identical Motion for Joinder and Affidavit on September 4, 2006. Attached to that are some pages copied from Jirah Kelley's filing of July 26, 2006, including a Motion for a Preliminary Injunction, Protective Order and a Joinder Motion for Production of Any and All Discovery.

A second batch of inmate motions were filed early this year. They include a Motion for Appointment of Counsel and a Motion for Civil Contempt: 18 USC § 401(3), filed on January 7, 2007, and

signed by William O'Brien, John Pierce, Eric Day, William Thomas and Mark S. Geisser. Movants identify themselves as inmates incarcerated at the John J. Moran building (Medium One) and members of the plaintiff class. In their attached Statement of Facts, the inmates allege that Defendants are violating the terms of the Settlement Agreement by double celling in 288 cells designated as single-bunked cells in the Medium One facility.

Finally, Thomas G. Webb filed a Motion for Temporary Restraining Order on January 12, 2007, which also addresses the issue of double bunking at the Medium facility, and requests a court order to prevent Defendants from violating the population limits imposed by the Settlement Agreement, "also to cease and desist from building more bunks, installing more bunks and using unlawful bunks unnecessarily installed in the housing units nor in segregation unit..."

ACI Response

The Deputy Chief Legal Counsel for the Department of Corrections ("ACI Counsel") has responded to the inmates' submissions. In response to the civil contempt Motion co-filed by O'Brien, Pierce, Geisser, Eric Day and Thomas, ACI Counsel argues that the inmates are misreading the terms of the Settlement Agreement to find a continuing duty for the ACI to obtain court approval for any physical alterations to the facility. In fact, ACI Counsel points out, Defendants were held

to be in substantial compliance with the terms of the Settlement Agreement and the case was dismissed in 1995. As for the double bunking that the inmates complain of, it was approved by the Settlement Agreement and modified by the Stipulation entered into by the parties on February 3, 2003.

In response to the Motions for Joinder filed by Kenneth Day, Wesley Mello, and Jirah Kelley, ACI Counsel argues that there is no active case for the inmates to join, and that, anyway, when the case was active, it did not involve the kinds of issues raised by Kelley, Day and Mello.

## Analysis

In order to address the new motions before the Court, it is necessary to look again and more closely at the Settlement Agreement, specifically which provisions were dissolved with the Stipulation of Dismissal and which provisions may retain some vitality.

### *Conditions at the ACI*

A close review of the Settlement Agreement reveals its drafters' intent to resolve and conclude all aspects of the class action litigation, with the exception of the population restrictions. Although ACI Counsel argues that the substandard conditions of incarceration of the sort complained about by O'Brien, et al., were never the subject of the original Palmigiano orders, this is not the case. Specifically included

in the Settlement Agreement are: medical, mental health and dental care (Sec. IV); environmental health and safety (Sec. V); and conditions regarding management, security and inmate activity (Sec. VI). The Agreement set forth a detailed time schedule for monitoring compliance in these areas (Sec. VIII), including a 'lights out' or 'sunset' provision for such monitoring: "Upon receipt of the Monitors' reports of substantial compliance, the defendants shall file with the Court a motion to dismiss this lawsuit and dissolve any outstanding orders in Palmigiano v. Sundlun, except the provisions of Section III of this Settlement Agreement (Overcrowding Restrictions)." (Sec. III, ¶ G). The Agreement then mandated a four-month period of monthly self-monitoring by Defendants. Section III, ¶ I, provided that,

> [A]t the end of the four (4) month period set forth in Section VIII, Paragraph H and provided that the defendants demonstrate continuing substantial compliance, the parties, without further recourse to judicial proceeding, including appellate review, shall execute and file a stipulation dismissing this lawsuit and dissolving any outstanding orders....

In its final section, the Settlement Agreement reiterated that the "plaintiffs shall not seek additional relief in connection with this lawsuit ..." (Sec. X, ¶ B).

That all of the scheduled benchmarks were attained is demonstrated by the Stipulation of Dismissal, timely-filed on July 10, 1995, which asserted that Defendants were in substantial

compliance, and which provided in paragraph 4 that the lawsuit and all outstanding decrees would be dismissed, except for the overcrowding provisions. Based on these documents, this Court concludes that any complaints from current inmates concerning medical, mental health and dental care; environmental health and safety; and management, security and inmate activity are not properly brought within the framework or imprimatur of the 1974-1975 class action litigation. If present inmates seek to pursue legal remedies for complaints about their treatment or conditions of incarceration, those complaints must be pursued in a new civil rights lawsuit, or, first, via the administrative remedies available through the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

*Overcrowding*

It is likewise clear to this Court that, when the terms of the settlement were reached, the parties envisioned a different and separate status for the provisions of the Agreement setting forth population restrictions. In the Notice to All Members of Plaintiff Class, disseminated to all ACI inmates on April 13, 1994, this writer stated, "The population portions of the agreement will remain permanently in effect." The Settlement Agreement, Section III, paragraphs A through E, set forth general and specific limitations on prison population in the various ACI facilities. Paragraph G states that "Paragraphs A through E

inclusive of Section III shall be enforceable in any federal or state court of competent jurisdiction."

Section VIII again clearly states that, after the dismissal of the lawsuit and the dissolution of outstanding orders, except the overcrowding restrictions: "The provisions of Section III of this Agreement shall survive the aforesaid dismissal and continue to be enforceable in accordance with the provisions of Section III, paragraph G." Sec. VIII, ¶ I.

In Section IX, the Settlement Agreement calls for the creation of a "permanent state prison overcrowding control mechanism." The Settlement Agreement states that if this State Mechanism is indeed created and vested with the authority to enforce the population restrictions, and if it exercises that authority effectively, then "the provisions of Section III of this Settlement Agreement shall not be enforceable in this Court and plaintiffs agree not to bring any action or proceeding to enforce said provisions." Sec. IX, ¶ E.

> F. In the event that the State Mechanism is disbanded or discontinued, or loses its authority and power to enforce the aforesaid population capacities and restrictions effectively, or fails to exercise its authority and power to enforce the population capacities and restrictions effectively, the provisions of paragraph E of this Section shall be null and void and plaintiffs shall have the right to seek enforcement of the provisions of Section III.

Section IX, ¶ F.

The so-called State Mechanism, the Governor's Justice Commission, was created in 1993 by statute, R.I. Gen. Laws § 42-26-13, with the express purpose of maintaining court-ordered population capacities at the ACI. The Court is unaware of the Commission's current status. Before this Court could take any action concerning the population restrictions in the Settlement Agreement (modified by stipulation since then), there would have to be, as a threshold, a demonstration of the dissolution of the Commission, or a demonstration of the Commission's failure to properly exercise its authority to enforce those restrictions.

Even if such a demonstration were made convincingly to the Court, there remains the question of who may enforce the provisions of Section III of the Settlement Agreement. Section IX, paragraph F, states that "plaintiffs" would have the right to seek enforcement. The Order certifying the Class defines it as "Plaintiffs and those similarly situated, namely, all those incarcerated at the Adult Correctional Institutions...." Order, ¶ 1, July 23, 1976. But, in his memorandum of law, Plaintiffs' Counsel described Plaintiffs as "the class of detainees and sentenced prisoners who are presently confined in any of the Adult Correctional Institutions or who may in the future be confined in any of those facilities." Plaintiffs' Memorandum in Support of the Proposed Settlement Agreement, June 10, 1994. Assuming that the present inmates are deemed to be members of the

Plaintiff Class, or, at least, the intended beneficiaries of the Settlement Agreement, then the additional issue arises of how they may properly move to enforce the terms of the Agreement.

According to the First Circuit, "A party to a settlement agreement may seek to enforce the agreement's terms when the other party reneges. If, at the time of the claimed breach, the court case already has been dismissed, the aggrieved party may bring an independent action for breach of contract." Malave v. Carney Hospital, 170 F.3d 217, 220 (1st Cir. 1999). Just because a federal court presides over a lawsuit that leads to a settlement agreement does not mean that the court has jurisdiction to enforce the settlement agreement. F.A.C. v. Cooperativa de Seguros de Vida, 449 F.3d 185, 189 (1st Cir. 2006); *see also* U.S. v. Coloian, 2007 WL 824395 (1st Cir. 2007). Only while the action is still pending does the District Court retain jurisdictional authority to enforce the settlement agreement. Quint v. A. E. Staley Mfg. Co., 246 F.3d 11, 14 (1st Cir. 2001). The District Court may also enforce a settlement agreement in cases where the Court has expressly retained jurisdiction over the settlement agreement, or incorporated the terms of the settlement agreement in the stipulation of dismissal. Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 381-82 (1994), Metro-Goldwyn Mayer, Inc. v. 007 Safety Products, Inc., 183 F.3d 10, 14 (1st Cir. 1999).

None of these circumstances govern the present matter. The terms of the Settlement Agreement and the Stipulation of Dismissal clearly terminate the Court's jurisdiction. The provisions controlling medical, dental, and mental health care; environmental health and safety; and management, security and inmate activity, called for the complete dismissal and dissolution of all outstanding court orders. The provisions on population capacity transferred enforcement authority from the Court to the newly-created state task force, the Governor's Justice Commission. Consequently, the Court concludes that any effort to enforce the current population restrictions (including the recent stipulations) must be brought as a separate civil action for breach of contract.

## Conclusion

For the foregoing reasons, the Court denies the Motions of Eric Jirah Kelley, filed on July 26, 2006, November 20, 2006, and December 1, 2006; Wesley Mello, filed on September 4, 2006; Kenneth Day, filed on September 1, 2006; and Thomas G. Webb, filed on January 12, 2007; as well as the Motions of William O'Brien, John Pierce, Eric Day, William Thomas and Mark S.

Geisser, jointly filed on January 7, 2007, and any other motions or requests filed in conjunction therewith.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
April 4 ,2007