**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| NICHOLAS A. PALMIGIANO, et al. | : | |
| v. | : | C.A. No. 74-0172L |
| BRUCE G. SUNDLUN, Governor of the State of Rhode Island, and George Vose, in his capacity as Director, Rhode Island Department of Corrections[1] | : | |
| THOMAS R. ROSS, et al. | : | C.A. No. 75-0032L |
| v. | : | |
| BRUCE G. SUNDLUN, Governor of the State of Rhode Island, and George Vose, in his capacity as Director, Rhode Island Department of Corrections | : | |

**STIPULATION**

WHEREAS, the parties entered into a Final Settlement Agreement dated March 18, 1994 and approved by the United States District Court for the District of Rhode Island on July 15, 1994. (Copy is attached);

WHEREAS, there have been recent population increases at the Adult Correctional Institutions;

WHEREAS, Defendants have submitted a plan to Plaintiffs' counsel to increase the capacities in the John J. Moran Medium Security facility by adding an additional overhead bunk in 144 cells;

WHEREAS, Defendants have also submitted a plan to Plaintiffs' counsel to increase the capacity in the High Security Center by adding an additional overhead bunk

[1] These were the named Defendants when the case was closed in 1994. Presently, Donald Carcieri is the Governor and A.T. Wall is the Director of the Department of Corrections.

in 18 cells (12 in C-mod; and 6 in D-mod). The parties further agree to subtract from the population capacity the 8 hospital beds from the 1994 settlement, as they have been converted into a medical office and examination space; therefore the net increase to the population capacity at the High Security Center is actually 10;

WHEREAS, in 2002 the parties entered into a Stipulation to increase the capacity at the Women's facility (known as the Gloria McDonald facility)[2] to 153, and the parties now agree that that number was erroneous and should have been 154.

Now, the parties agree to the following amendments of the Final Settlement Agreement, which was dated March 18, 1994, approved by the Court on July 15, 1994, and subsequently amended in June, 1995, further amended on December 20, 1996, approved by the Court on January 3, 1997; further amended on March 4, 1998, approved by the Court on March 27, 1998; further amended on May 16, 2002, approved by the Court on May 31, 2002; and further amended on February 3, 2003 and approved by the Court on February 11, 2003. (Copies of said Modifications are attached).

The Final Settlement Agreement, dated March 18, 1994, in Section III, ¶ D. 1 provided that the total capacity of the John J. Moran Medium security facility shall be 898. That capacity was further amended by agreement to permit an increase to 922. The Defendants now seek to increase the facility's capacity by 144 bunks. Therefore the total capacity for the John J. Moran Medium Security facility shall be 1066.

The Final Settlement Agreement dated March 18, 1994, in Section III, ¶ D. 5 provided that the total capacity of the High Security Center shall be 156. That total included 8 hospital beds. Now the parties agree that the 8 hospital beds may be reduced

[2] The Gloria McDonald facility was previously known as the Women's Jonathan Arnold facility in the Final Settlement Agreement.

from the total capacity as that area has been converted into a medical office and examination space. The parties further agree that 18 cells in the High Security Center (12 cells in C-mod., and 6 cells in D-mod) may be increased by installing an additional overhead bunk. Therefore, the total capacity in the High Security Center will now be 166.

The Final Settlement Agreement dated March 18, 1994, in Section III, ¶ D. 3 provided that the total capacity of the Women's facility shall be 125. That capacity was further amended by agreement in on December 20, 1996, approved by the Court on January 3, 1997, so that the population capacity was increased to 145. In the May, 2002 agreement, the parties agreed to increase the population capacity at the Women's facility to 153. The parties now agree that the capacity of 153 as set in the 2002 modification was an error and should have been 154. The parties now so amend the population capacity of the Women's facility to 154.

The Defendants have now verified that the aforementioned increases would not be detrimental to the infrastructure of the facilities and would improve prison management. Plaintiffs' counsel has inspected the facilities and confirmed that the requisite population increases will not impair or infringe upon inmates' rights.

All other provisions of the Agreement remain in full force and effect.

Dated: July 27 2007

Attorney for the Plaintiffs

Alvin J. Bronstein, Esq.
6618 31st Street, N.W.
Washington, D.C. 20015

Attorneys for the Defendants

Richard B. Woolley, #1452
Assistant Attorney General
150 South Main Street
Providence, RI 02903

Patricia A. Coyne-Fague, #5198
Executive Counsel
RI Department of Corrections
40 Howard Avenue
Cranston, RI 02920

Approved and so Ordered:

Ronald R. Lagueux
Senior United States District Judge

Date: August 1, 2007

95

RECEIVED
JUN 21 1995
CLERK
U. S. DISTRICT COURT
DISTRICT OF R. I.

DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NICHOLAS A. PALMIGIANO, et al., v. LINCOLN ALMOND, et al. | C.A. No. 74-172 |
| THOMAS R. ROSS, et al., v. LINCOLN ALMOND, et al. | C.A. No. 75-032 |

STIPULATION TO MODIFY FINAL SETTLEMENT AGREEMENT

The parties hereby agree to the following amendment of the Final Settlement Agreement in the above-entitled case which is dated March 18, 1994 and approved by the Court on July 15, 1994.

The above agreement provided in Section III, ¶ C.3 that the population capacity at the Women's Jonathan Arnold Facility shall be one hundred and ten (110). It further provided that if certain environmental improvements and changes were completed by the defendants, the capacity at that facility may be increased to one hundred and twenty-five (125).

The defendants have now verified that the aforementioned environmental improvements and changes have been completed and plaintiffs' counsel has inspected the facility and confirmed that the improvements and changes have been completed.

Accordingly, it is stipulated and agreed that Section III, ¶ C.3 of the above agreement is modified to the extent that the population capacity at the Women's Jonathan Arnold Facility shall hereafter be one hundred and twenty five (125).

All other provisions of the above agreement remain in full force and effect.

Dated: May 16, 1995

Attorneys for the Plaintiffs

Alvin J. Bronstein
Mark J. Lopez
The National Prison Project
of the ACLU Foundation
1875 Connecticut Ave.,
Suite 410
Washington, DC 20009

Attorneys for the Defendants

Maureen Glynn
Special Asstistant Attorney
General
72 Pine Street
Providence, RI 02903

Attorney for Defendant
LINCOLN ALMOND in his
capacity as Governor of
the State of Rhode Island

Joseph S. Larisa, Jr. (#4113)
Executive Counsel to the
Governor
State House Room 119
Providence, RI 02903
(401) 277-2080 ext. 216

Anthony A. Cipriano, Esq.
Chief Legal Counsel
Rhode Island Department
of Corrections
75 Howard Avenue
Cranston, RI 02920

Approved and So Ordered:

Ronald R. Lagueux
Chief United States District Judge
6/22/95

97

RECEIVED

0091c/1-3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NICHOLAS A. PALMIGIANO, et al. | : | C.A. No. 74-0172 |
| v. | : | |
| LINCOLN C. ALMOND, et al. | : | |
| THOMAS R. ROSS, et al. | : | C.A. No. 75-0032 |
| v. | : | |
| LINCOLN C. ALMOND, et al. | : | |

**STIPULATION**

WHEREAS, the parties entered into a Final Settlement Agreement dated March 18, 1994 and approved by the United States District Court For The District of Rhode Island on July 15, 1994 (a copy is attached);

WHEREAS, there have been recent population increases at the Women's facilities (known as Gloria McDonald facility)[1/] and Intake Service Center South ("ISC") facilities which were covered by the Final Settlement Agreement;

WHEREAS, Defendants have submitted a plan to increase the capacities in the Women's Gloria McDonald facility and the Intake Center South facility by reconfiguring certain space and usage in said facilities;

---

1/ The Gloria McDonald facility was previously known as the Women's Jonathan Arnold facility in the Final Settlement Agreement.

Now, the parties agree to the following amendments of the Final Settlement Agreement which was dated March 18, 1994, approved by the Court on July 15, 1994, and subsequently amended in June, 1995. (A copy of the June 1995 Modification is attached.) The Final Settlement Agreement, as modified in June 1995, provided in Section III, ¶ D.3 that the population capacity at the Women's Prison Facility shall be one hundred twenty-five (125). The Defendants seek to increase the population capacity for the Women's Prison Facility (known as the Gloria McDonald facility) to one hundred forty-five (145).

The Final Settlement Agreement, dated March 18, 1994, in Section III, ¶ D.4 provided that the ISC South population capacity shall be two hundred fifty-eight (258). The Defendants seek to increase the population capacity in the ISC South by fifty-eight (58), as set forth:

- Module I - increase to forty-six (46),
- Module J - increase to twenty-four (24),
- Module K - increase to forty-six (46),
- Module L - increase to forty-six (46), and
- Hospital beds - increase of an additional ten (10) beds.

Therefore, the total capacity for ISC South shall be three hundred sixteen (316).

The Defendants have now verified that the aforementioned increases would not be detrimental to the infrastructure of the facilities and would improve prison management. Plaintiffs' counsel has inspected the facilities and confirmed that the requested population increases at the Women's Gloria McDonald facility and ISC South would not impair or infringe upon inmates' rights.

Accordingly, it is stipulated and agreed that Section III, ¶ D.3 is modified to the extent that the population capacity at the Women's Gloria McDonald facility shall hereinafter be one hundred forty-five (145) and Section III, ¶ D.4 is modified to the extent that the population capacity at ISC South shall hereinafter be three hundred sixteen (316), permitting greater than fifty percent (50%) double celling in Modules I, J, K, and L as set forth herein.

All other provisions of the Agreement remain in full force and effect.

Dated: December 20, 1996

Attorneys for the Plaintiffs

Alvin J. Bronstein, Esq.
The National Prison Project
of the ACLU Foundation
1875 Connecticut Avenue
Suite 410
Washington, DC 20009

Attorneys for the Defendants

Maureen G. Glynn #3800
Special Assistant
Attorney General
150 South Main Street
Providence, RI 02903

Anthony A. Cipriano, Esq.
Chief Legal Counsel
Rhode Island Department
of Corrections
75 Howard Avenue
Cranston, RI 02920

Approved and So Ordered:

Chief United States District Judge

Date: 1/3/97

98

0091c/1-3

LEGAL COUNSEL
APR 7 1998
DEPT. OF CORRECTIONS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NICHOLAS A. PALMIGIANO, et al. | : | C.A. No. 74-0172 |
| v. | : | |
| BRUCE SUNDLUN, et al. | : | |
| THOMAS R. ROSS, et al. | : | C.A. No. 75-0032 |
| v. | : | |
| BRUCE SUNDLUN, et al. | : | |

## STIPULATION

WHEREAS, the parties entered into a Final Settlement Agreement dated March 18, 1994 and approved by the United States District Court For the District of Rhode Island on July 15, 1994 (a copy is attached);

WHEREAS, Defendants have submitted a plan to increase the capacities in the Medium II facility[1] by reconfiguring certain usage in said facilities;

Now, the parties agree to the following amendments of the Final Settlement Agreement which was dated March 18, 1994, approved by the Court on July 15, 1994, and subsequently amended in June, 1995. (A copy of the June 1995 Modification is attached.)

[1] Medium II facility was previously known as the Special Needs Facility in the Final Settlement Agreement.

The Final Settlement Agreement, dated March 18, 1994, in Section III, ¶ D.2 provided that this facility's population capacity shall be two hundred fifty (250). The Defendants seek to increase this population capacity in the Medium II facility by forty-two (42), as set forth:

- A Dorm - increase to sixty-eight (68),
- B Dorm - increase to sixty-eight (68),
- C Dorm - increase to sixty-eight (68).

Therefore, the total capacity for Medium II shall be two hundred ninety-two (292).

Furthermore, the Settlement Agreement provided in Section III, ¶ D.2 that "If F Dorm is constructed, capacity can be increased to Three Hundred and Four (304) (fifty-four (54) inmates in F Dorm)".[2] The defendants seek to increase this population capacity in F Dorm by fourteen inmates as set forth:

- F Dorm -- increase to sixty-eight (68).

Therefore once F Dorm is constructed, the total capacity for Medium II shall be three hundred sixty (360).

The Defendants have now verified that the aforementioned increases would not be detrimental to the infrastructure of the facilities and would improve prison management. Plaintiffs' counsel has inspected the facilities and confirmed that the requested population increases would not impair or infringe upon inmates' rights.

Accordingly, it is stipulated and agreed that Section III, ¶ D. 2 is modified to the extent that the population capacity at the Medium II facility shall hereinafter be two hundred ninety-two (292) and that after F Dorm is constructed the population capacity at the Medium II facility shall be three

[2]The dormitory referred to as "F Dorm" in the Settlement Agreement and in this Stipulation is now known as E Dorm on the Department's operational rosters.

hundred sixty (360).

All other provisions of the Agreement remain in full force and effect.

Dated: March 4, 1998

Attorneys for the Plaintiffs

Alvin J. Bronstein, Esq.
The National Prison Project
of the ACLU Foundation
1875 Connecticut Avenue
Suite 410
Washington, DC 20009

Attorneys for the Defendants

Maureen G. Glynn #3800
Assistant Attorney General
150 South Main Street
Providence, RI 02903

Anthony A. Cipriano, Esq.
Chief Legal Counsel
Rhode Island Department
Of Corrections
40 Howard Avenue
Cranston, RI 02920

Approved and So Ordered:

Ronald R. Lagueux
Chief United States District Judge

Date: 3/27/98

Lincoln C. Almond is now Governor of the State of Rhode Island

02
LEGAL COUNSE
JUN 3 - 2002
DEPT. OF CORRECTIOI

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RECEIVED
MAY 17 2002
Property of U.S. District Court
District of Rhode Island

NICHOLAS A. PALMIGIANO, et al

v. C. A. NO. 74-0172

LINCOLN C. ALMOND, et al

THOMAS R. ROSS, et al

v. C. A. NO. 75-0032

LINCOLN C. ALMOND, et al

STIPULATION

WHEREAS, the parties entered into a Final Settlement Agreement dated March 18, 1994 and approved by the United States District Court For The District Of Rhode Island on July 15, 1994 (a copy is attached);

WHEREAS, there have been recent population increases at the Women's facility (known as Gloria McDonald facility)[1] and Intake Service Center South ("ISC") facility which were covered by the Final Settlement Agreement;

WHEREAS, Defendants have submitted a plan to increase the capacities in the Women's Gloria McDonald facility and the Intake Service Center South facility by reconfiguring certain space and usage in said facilities;

Now, the parties agree to the following amendments of the Final Settlement Agreement which was dated March 18, 1994, approved by the Court on July 15, 1994, and subsequently amended in June, 1995, further amended on December 20, 1996 and approved by the Court on January 3, 1997. (Copies of said Modifications are attached).

[1] The Gloria McDonald facility was previously known as the Women's Jonathan Arnold facility in the Final Settlement Agreement.

The Final Settlement Agreement, as modified in June 1995, provided in Section III, ¶ D.3 that the population capacity at the Women's Prison Facility shall be one hundred twenty-five (125) and was further modified in December, 1996 so that the population capacity at the Women's Prison Facility (known as the Gloria McDonald facility) was increased to one hundred forty-five (145). The Defendants now seek to increase the population capacity in the Women's Division by eight (8) beds. Therefore, the total capacity for Women's Division shall be one hundred fifty three (153) beds.

The new configuration will involve the conversion of three (3) rooms. These rooms are currently under-utilized and their conversion to living quarters will not impact programming or programming space.

The Final Settlement Agreement, dated March 18, 1994, in Section III, ¶ D.4 provided that the ISC South population capacity shall be two hundred fifty-eight (258). The amended Settlement Agreement, dated December 20, 1996 increased the population capacity in ISC South to three hundred sixteen (316). The Defendants now seek to increase the population capacity in the ISC South facility by forty-eight (48) beds. Therefore, the total capacity for ISC S shall be three hundred sixty-four (364).

The Defendants have now verified that the aforementioned increases would not be detrimental to the infrastructure of the facilities and would improve prison management. Plaintiffs' counsel has inspected the facilities and confirmed that the requested population increases will not impair or infringe upon inmates' rights.

Accordingly, it is stipulated and agreed that Section III, ¶ D.3 is modified to the extent that the population capacity at the Women's Gloria McDonald facility shall hereinafter be one hundred fifty-three (153) and Section III, ¶ D.4 is modified to the extent

that the population capacity at ISC South shall hereinafter be three hundred sixty-four (364), permitting total double celling in all modules.

All other provisions of the Agreement remain in full force and effect.

Dated: May 16, 2002

Attorney for the Plaintiffs

Alvin J. Bronstein, Esq.
6618 31st Street, N. W
Washington, DC 20009

Attorneys for the Defendants

Richard B. Woolley, Esq.
Deputy Chief Civil Division
Department of the Attorney General
150 S. Main Street
Providence, RI 02903

Anthony A. Cipriano, Esq.
Chief Legal Counsel
Rhode Island Department
of Corrections
40 Howard Avenue
Cranston, RI 02920

Approved and So Ordered:

Senior United States District Judge

Date: 5/31/02

'03

LEGAL COUNSEL
FEB 13 2003
DEPT. OF CORRECTIONS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NICHOLAS A. PALMIGIANO, et al

v. C. A. NO. 74-0172

LINCOLN C. ALMOND, et al

THOMAS R. ROSS, et al

v. C. A. NO. 75-0032

LINCOLN C. ALMOND, et al

RECEIVED
FEB 10 2003
Property of U.S. District Court
District of Rhode Island

STIPULATION

WHEREAS, the parties entered into a Final Settlement Agreement dated March 18, 1994 and approved by the United States District Court For The District Of Rhode Island on July 15, 1994. (Copy is attached):

WHEREAS, there have been recent population increases in the segregation unit at Medium Security (known as the John J. Moran Medium Security facility), which was covered by the Final Settlement Agreement.

WHEREAS, Defendants have submitted a plan to increase the capacity in the segregation unit of the John J. Moran Medium Security facility by adding an additional overhead bunk bed in each cell.

WHEREAS, Defendants have assured Plaintiff's counsel that any segregation inmates who will be double celled will first be carefully screened to minimize any potential for risk or danger, and any such double celling in segregation will be limited in duration to a maximum period of thirty (30) days for any single incident.

Now, the parties agree to the following amendments of the Final Settlement Agreement, which was dated March 18, 1994, approved by the Court on July 15, 1994, and subsequently amended in June, 1995, further amended on December 20, 1996,

approved by the Court on January 3, 1997, and further amended and approved by the Court on May 31, 2002. (Copies of said Modifications are attached).

The Final Settlement Agreement, dated March 18, 1994, in Section III, ¶ D. 1 provided that the John J. Moran Medium Security facility segregation unit capacity shall be twenty- four (24) cells, single bunked. The Defendants now seek to increase the segregation unit capacity in the John J. Moran Medium Security facility by twenty-four (24) beds. Therefore, the total capacity for the John J. Moran Medium Security facility segregation unit shall be forty-eight (48) beds.

The Defendants have now verified that the aforementioned increases would not be detrimental to the infrastructure of the facilities and would improve prison management. Plaintiff's counsel has reviewed the plan to increase said capacity and agreed that the requested population increases will not impair or infringe upon inmates' rights.

Accordingly, it is stipulated and agreed that Section III, ¶ D. 1 is modified to the extent that the population capacity in the segregation unit at the John J. Moran Medium Security facility shall hereinafter be forty-eight (48) beds, permitting total double celling of the entire module.

All other provisions of the Agreement remain in full force and effect.

Dated: February 3, 2003

Attorney for the Plaintiffs

[signature]

Alvin J. Bronstein, Esq.
6618 31st Street, N. W.
Washington, DC 20009

Attorneys for the Defendants

[signature]

Richard B. Woolley, Esq. #1452
Special Assistant Attorney General
Dept. of the Attorney General
150 South Main Street
Providence, R. I. 02903

[signature]

Anthony A. Cipriano, Esq.
Chief Legal Counsel
Rhode Island Dept. of Corrections
40 Howard Avenue
Cranston, R. I. 02920

Approved and So Ordered:

Ronald R. Lagueux

Ronald R. Lagueux
Senior United States Judge

Date: 2/11/03.

0030c
0029c

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NICHOLAS A. PALMIGIANO, et al. | : | C.A. No. 74-0172 |
| v. | : | |
| BRUCE G. SUNDLUN, et al. | : | |
| THOMAS R. ROSS, et al. | : | C.A. No. 75-0032 |
| v. | : | |
| BRUCE G. SUNDLUN, et al. | : | |

## SETTLEMENT AGREEMENT

### I. INTRODUCTION

This case has had a long and complicated history[1]. After an extended trial in 1977, this Court declared that the entire Rhode Island prison system was unconstitutional and entered an extensive remedial order[2]. During the next fifteen years, there were

1 See, e.g., the series of decisions variously reported as Palmigiano v. Garrahy or Palmigiano v. DiPrete, 443 F.Supp. 956 (D.R.I. 1977); 448 F.Supp. 659; 466 F.Supp. 732, aff'd, 616 F.2d 598 cert. den., 449 U.S. 839; 599 F.2d 17; 639 F.Supp. 244; 700 F.Supp. 1180 (1988); 710 F.Supp. 875 (1989); aff'd, 887 F.2d 258 (1st Cir. 1989); 737 F.Supp. 1257 (D.R.I. 1990).

2 Palmigiano v. Garrahy, 443 F.Supp. 956, 986 (D.R.I. 1977).

modifying orders, adjudications of contempt against the defendants (various state officials) and the imposition of sanctions. Most of the problems during those years were related or attributable to overcrowding in the Rhode Island prison system. In every instance, the Court found that the overcrowding had a serious deleterious impact on medical care and environmental health and safety and on numerous occasions, experts supported those findings[3].

On January 10, 1991, Senior United States District Judge, Raymond J. Pettine, who had presided over this case from its inception, conducted a chambers conference with all the parties on the occasion of his transferring the case to United States District Judge Ronald R. Lagueux. At that time, Judge Pettine urged a comprehensive approach to the problems of prison overcrowding and, in a final order, stated: "Now is the time to institute safeguards that will forestall and hopefully prevent a recurrence of the past frustrating, costly and devastating ills."

The parties have had a series of meetings during the past two years and the current defendants, Governor Bruce G. Sundlun and Department of Corrections Director George A. Vose, Jr., have begun a comprehensive approach to the solution of overcrowding problems in Rhode Island's prison system. Among other things, on December 3, 1992, Governor Sundlun signed an Executive Order[4] creating a

[3] See, e.g., Palmigiano v. Garrahy, 639 F.Supp. 244 (D.R.I. 1986).

[4] No. 92-26.

Governor's Commission to Avoid Future Prison Overcrowding and Terminate Federal Court Supervision Over the ACI[5]. This Commission was charged with developing a detailed action plan including legislative and policy initiatives for dealing with the state's prison population. The Commission was also directed to consider the creation of a permanent mechanism to maintain the ACI prison population within its capacity on an ongoing basis.

On February 15, 1993, the Commission issued a detailed report together with recommended changes in the Rhode Island criminal justice system and recommended legislation. The Rhode Island General Assembly, thereafter, enacted legislation providing for intermediate sanctions, and a Criminal Justice Oversight Committee.[6]

---

[5] The "ACI," or Adult Correctional Institutions, is the common term for the entire Rhode Island prison system.

[6] Title 12, Chap. 19, Sec. 23.1 et seq. of the General Laws of the State of Rhode Island provides for a wide range of intermediate punishments.

The second bill adopted by the legislature, Title 42, Chap. 26, Sec. 13 et seq., creates a criminal justice oversight committee responsible for coordinating policies of the components of the criminal justice system to control overcrowding in times of crisis. The committee would set annual goals, monitor developments quarterly, especially those related to potential overcrowding, and urge the adoption of appropriate and statutorily authorized steps to reduce overcrowding in a time of crisis.

The parties believe that these recent initiatives by the defendants and other state officials are consistent with important principles of federalism, create the potential for establishing the ACI as a constitutional prison system, and may result in completely restoring authority over a constitutional state prison system where it belongs, in the hands of responsible state officials.

The defendants have recently discontinued the use of the Special Needs Facility (also known as Old Medium Security) as a secure facility, and may plan to convert that facility into a reintegration facility, a facility designed to house a variety of prisoners and programs within the defendants' framework of intermediate sanctions.

Because the parties are interested in resolving plaintiffs' concerns about areas of possible non-compliance, in addressing proposals that defendants might have for modification of existing orders, and in addressing the ultimate termination of compliance monitoring and the Court's active supervision of the remedial orders in this cause, the parties hereby enter into this Settlement Agreement on this 18th day of March, 1994.

## II. DEFINITIONS

A. "Adequate Programming" shall mean the level of programming being provided at the time of the notification of substantial compliance by the Monitors as provided for hereafter.

B. "Decrees" shall mean the Order of the Court entered on August 10, 1977, Palmigiano v. Garrahy, 443 F.Supp. 956 (D.R.I. 1977) and all subsequent Orders in this case governing conditions or practices at the ACI.

C. "Defendants" shall mean the Governor of the State of Rhode Island and the Director of the Department of Corrections.

D. "Defendants' Counsel" shall mean the Attorney General for the State of Rhode Island or his designee, the Executive Counsel to the Governor of the State of Rhode Island or her designee, and Chief Legal Counsel to the Department of Corrections or his designee.

E. "Double-celling" shall mean the placement of two (2) prisoners in a cell.

F. "Existing Facilities" or "Facilities" shall mean the following facilities housing members of the plaintiff class which are in existence on the effective date of this Settlement Agreement. They are as follows:

Medium Security Facility (MED)
Special Needs Facility (SNF)
Women's Jonathan Arnold (Women's)
Intake Service Center South (ISC SO)
Intake Service Center North (ISC NO)
High Security Center (HSC)
Maximum Security Facility (MAX)

It is understood that some members of the plaintiff class are housed in ACI facilities not listed above. Those facilities are the Minimum Security Facility, the Work Release Facility (Bernadette Building) and the Women's Work Release Facility (Dix Building). Although those latter facilities are included in the various remedial orders of the Court, they have not been the subject of population overcrowding concern.

G. "Newly Constructed Facility" shall mean any facility housing members of the plaintiffs' class that is completed after the effective date of this Settlement Agreement and shall include additions to an existing facility.

H. "Plaintiffs" shall mean prisoners housed at the Adult Correctional Institutions.

I. "Plaintiffs' Counsel" shall mean Alvin Bronstein, Mark Lopez and other lawyers employed by the National Prison Project of the American Civil Liberties Union Foundation, 1875 Connecticut Avenuue, NW, Ste. 410, Washington, D.C. 20009.

J. "Substantial Compliance" shall mean that the defendants have generally fulfilled the remedial provisions of the August 10, 1977 Order, as amended, and all subsequent orders of this Court, governing the delivery of medical, dental and mental health services; environmental health and safety conditions and practices; and, management, security and inmate activity issues. In the event that achieving substantial compliance requires the defendants to make any capital improvements, alterations, or renovations, they may achieve substantial compliance in the following manner. The defendants shall prepare and submit to plaintiffs' counsel a written document which sets forth in detail a plan for the improvement, alteration, or renovation, the amount of funds required, the source of those funds, and a specific timetable for completing the work. If counsel for plaintiffs approve of the foregoing plans in writing, the defendants shall be entitled to a finding of substantial

compliance from the date of such written approval rather than the actual completion of the capital improvement, alteration, or renovation. Plaintiffs' Counsel shall not unreasonably withhold approval.

## III. RESTRICTIONS ON OVERCROWDING

A. Areas not designed and built for housing prisoners shall not be utilized for the housing of prisoners. For example, prisoners shall not be housed in corridors, hallways, dayrooms, program space, office space, recreation space or general purpose space.

B. Except as provided in Paragraph C of this Section III, defendants agree that they will not assign more than one person to a cell in existing facilities. Defendants may assign two prisoners to a cell in newly constructed facilities provided that the prisoners are not classified as maximum security; that such cells shall adhere to the space requirements as set forth in the American Correctional Association Standards in effect at the time of execution of this Agreement[7]; and such cells allow prisoners direct access to toilet and hand washing facilities without assistance from a staff member.

[7] The reference in text is to the American Correctional Association Standard 3-4128 (1991) and 3-4128-1 (1994), copies are attached to the Agreement as Appendix A.

C. 1. Defendants shall be permitted to double-cell some prisoners in HSC, Medium, ISC NO and ISC SO, as detailed in Paragraph D of this Section III, provided that the specific conditions set forth in Paragraph D are met. Units designated as protective custody units in those four facilities may be double-celled.

2. Defendants shall ensure that sound classification practice and principle are followed before deciding to double-cell any particular prisoner.

D. The designated maximum population capacities for the following respective housing areas shall not be exceeded, except in the event of an emergency as set forth in Paragraph G.

| | | | |
|---|---|---|---|
| 1. | Facility: | Medium | |
| | Capacity: | 288 Cells Double Bunked | 576 |
| | | 288 Cells Single Bunked | 288 |
| | | 24 Segregation Cells Single Bunked | 24 |
| | | 4 Medical Cells | 4 |
| | | 6 Medical Ward | 6 |
| | TOTAL: | | 898 |

The double-celling in this facility is conditioned upon the installation of Two Hundred and Eighty-Eight (288) beds to create cells adaptable to double-celling. Such cells shall be divided proportionally among the six (6) regular housing units and double-celling is contingent upon each prisoner being adequately programmed and being allowed ten (10) hours out of cell time daily.

2. Facility: SNF (Only if used as a secure facility)

| | | | |
|---|---|---|---|
| Capacity: | A, B, C Dorms with 54 Inmates Each | 162 |
| | D Dorm | 32 |
| | A Honor Dorm | 20 |
| | Cell Block CBS | 20 |
| | Cell Block DCB | 16 |
| TOTAL: | | 250 |

The population capacities above are conditioned upon the defendants completing renovations to the following: D Dorm toilets; additional showers in Dorms A, B and C; toilets and showers in A Honor Dorm, all as called for in Special Needs Facility Recommendations (Powitz Report of 3/12/92)[8]. If F Dorm is constructed, capacity can be increased to Three Hundred and Four (304) (Fifty-four (54) inmates in F Dorm); if adequate toilet facilities and ventilation are installed in E Dorm, capacity can be further increased to Three Hundred and Twenty-Four (324) (Twenty (20) inmates in E Dorm).

3. Facility: Women's

| | | |
|---|---|---|
| Capacity: | Beds | 106 |
| | Segregation Cells | 4 |
| TOTAL: | | 110 |

If exhaust fans are installed and toilet areas are repaired as called for in Women's Division Recommendations #2 and #3 (Powitz Report of 3/12/92) the capacity may be increased to One Hundred and Twenty-Five (125).

[8] All references to Powitz Report are to a report and recommendations made by Robert Powitz, the defendants' environmental health expert. The report dated March 12, 1992, is attached hereto as Appendix B.

| | | | |
|---|---|---|---|
| 4. | Facility: | ISC South | |
| | Capacity: | 72 Cells Double Bunked | 144 |
| | | 72 Cells Single Bunked | 72 |
| | | 24 Segregation Cells Single Bunked | 24 |
| | | 8 Medical Cells | 8 |
| | | 10 Bed Medical Ward | 10 |
| | TOTAL: | | 258 |

The population capacities above are contingent upon the following:

a) limiting the use of this facility to confine pretrial detainees and convicted prisoners but only for a maximum of One Hundred and Twenty (120) days after sentencing (except for protective-custody prisoners permanently assigned to ISC). Pretrial detainees shall be separated from convicted prisoners;

b) double-celling only up to Fifty percent (50%) of the cells in each module;

c) each prisoner except those identified in Section III D(4)(d) (as stated below), shall be allowed Six and a Quarter (6.25) hours out of cell time daily;

d) each protective custody prisoner who is sentenced and classified shall be allowed ten (10) hours out of cell time daily;

e) implementation of upgrade corrections to ventilation system as called for in ISC South Recommendations #1 and #4 (Powitz Report of 3/12/92). If these contingencies are not complied with, all cells must be single occupancy for a total capacity of One Hundred and Sixty-Eight (168) (exclusive of medical beds).

| | | | |
|---|---|---|---|
| 5. | Facility: | ISC North | |
| | Capacity: | 392 Cells Double Bunked | 784 |
| | TOTAL: | | 784 |

The population capacities above are contingent upon the following:

a) limiting the use of this facility to confine pretrial detainees, and convicted prisoners but only for maximum of One Hundred and Twenty (120) days after sentencing (except for protective-custody prisoners permanently assigned to ISC). Pretrial detainees shall be separated from convicted prisoners;

b) each prisoner, except those identified in Section III, D(5)(c) (as stated below), shall be allowed Six and a Quarter (6.25) hours out of cell time daily;

c) each protective custody prisoner who is sentenced and classified shall be allowed ten (10) hours out of cell time daily.

| | | | |
|---|---|---|---|
| 6. | Facility: | HSC | |
| | Capacity: | 48 Cells Double Bunked | 96 |
| | | 24 Cells Single Bunked | 24 |
| | | 24 Segregation Cells Single Bunked | 24 |
| | | 4 Psychiatric Cells | 4 |
| | | 8 Bed Hospital Ward | 8 |
| | TOTAL: | | 156 |

The double-celling in this facility is limited to protective custody prisoners and conditioned upon the installation of forty-eight (48) beds to create cells adaptable to double-celling. Each prisoner being double-celled shall be adequately programmed and allowed ten (10) hours out of cell time daily. Under no circumstances shall maximum custody prisoners be double-celled at this facility, except those housed in the protective custody unit.

| | | | |
|---|---|---|---|
| 7. | Facility: | Maximum | |
| | Capacity: | Cells Single Bunked | 411 |
| | | Segregation Cells Single Bunked | 39 |
| | | Bed Medical Ward | 16 |
| | TOTAL: | | 466 |

If the ten (10) rear cells are renovated to contain sufficient natural light and ventilation to meet APHA Standards[9] in effect at the time of execution of this Agreement, capacity can be increased to Four Hundred and Seventy Six (476) inmates.

E. Dormitories used for the housing of prisoners shall provide each occupant with at least twenty-five (25) square feet of unencumbered floor space. This space requirement shall not include space encumbered by a bed or locker nor shall it include any available program space or dayroom space. These limitations shall

[9] Standards of the American Public Health Association.

not apply to newly constructed minimum security and work release facilities and newly constructed minimum security and work release facilities would be subject to the American Correctional Association Standards in effect at the time of execution of this Agreement. A copy of those standards are set forth in Appendix A.

F. In entering into this Settlement Agreement, the parties acknowledge that the safety and security of prisoners and staff are a matter of mutual concern. The parties further acknowledge that certain conditions and eventualities are within the contemplation of the parties. These include the possibility that the Rhode Island jail and prison system may experience a substantial increase or decrease in its population; that the rate of crime or conviction within the State of Rhode Island may continue at its current rate or increase or decrease substantially; that the incidence of parole may increase or decrease substantially; that the cost of construction of new facilities or renovation of existing facilities may increase or decrease substantially; that substantial difficulty may or may not be encountered by the Rhode Island Department of Corrections in attracting and employing security and non-security staff; and that substantial construction delays may or may not occur with respect to the renovation of existing units or the construction of new facilities, units or additions thereto. A condition or eventuality within the contemplation of the parties does not constitute a changed circumstance.

G. Paragraphs A through E inclusive of Section III shall be enforceable in any federal or state court of competent jurisdiction. The defendants shall comply with the population capacities set forth in Section III of this Settlement Agreement except in the following circumstances:

1. Any provision establishing population capacity or limits may be suspended, even in the absence of an emergency, if the suspension is temporarily necessary because of actions by members of the plaintiff class or if suspensions are sporadic or isolated in nature, provided that the suspension lasts no longer than five (5) consecutive days. Any such suspension, including the reason therefore, shall be reported to Plaintiffs' Counsel as promptly as is reasonably possible following the commencement of the suspension.

2. a) In the event of an emergency that makes substantial compliance with any of the terms of this Settlement Agreement impossible, extraordinarily difficult or unfeasible, it may be necessary to suspend temporarily, even beyond five (5) consecutive days, any provision that establishes population limits of this Settlement Agreement. In such event, the Director of the Rhode Island Department of Corrections shall formally declare a state of emergency, and, as soon as practical but no later than five (5) days after

such declaration, notify Plaintiffs' Counsel of the reasons that justified the suspension of any provision that establishes population limits of this Settlement Agreement. The defendants shall also notify Plaintiffs' Counsel of the expected duration of the suspension and the plan of the defendants to restore full operation of the Settlement Agreement.

b) For purposes of this Settlement Agreement, an emergency is defined as a circumstance caused by a riot, fire, hurricane or similar event not caused intentionally by the defendants, their agents, or employees, that makes substantial compliance with the provisions that establish population limits of this Settlement Agreement temporarily impossible, extraordinarily difficult or unfeasible. Construction delays or labor disputes not caused intentionally or reasonably anticipated by the defendants may constitute an emergency, but legislative, executive, or administrative policy decisions not to appropriate funds or allocate resources to the housing of prisoners shall not justify the declaration of an emergency. In addition, legislative or judicial decisions regarding sentencing shall not justify the declaration of an emergency.

c) In the event that the defendants seek to continue emergency suspension of any provision that establishes population limits of this Settlement Agreement for a period of time greater than ninety (90) days without the agreement of plaintiffs' counsel, the defendants may seek the Court's permission to suspend any provision that establishes population limits of this Settlement Agreement. In any such motion, the defendants bear the burden of persuasion.

3. If the plaintiffs' counsel believe that any suspension of any provision of this Settlement Agreement that establishes population limits or the duration of the suspension is unjustified, unreasonable, or taken in bad faith, they may request appropriate relief from the Court. In such event, the plaintiffs bear the burden of persuasion.

## IV. MEDICAL, MENTAL HEALTH AND DENTAL CARE

The defendants shall at all times maintain an adequate and constitutional system of medical, dental and mental health care. They shall employ sufficient staff to maintain a primary care system with a focus on preventive health care, health maintenance and prospective management of chronic disease.

V. ENVIRONMENTAL HEALTH AND SAFETY

The defendants shall at all times maintain environmental health and safety practices and conditions that are adequate and constitutional.

VI. MANAGEMENT, SECURITY AND INMATE ACTIVITY

The defendants shall at all times engage in practices and maintain conditions regarding management, security and inmate activity that are adequate and constitutional.

VII. INDEPENDENT MONITORS

A. The parties hereby designate Dr. Lambert King and Robert Powitz as independent monitors (Monitors) to observe and report upon substantial compliance with the terms of this Settlement Agreement. These Monitors are experts in the areas of medical care, environmental health, and fire safety. The Monitors shall observe and assess substantial compliance with the terms of this Settlement Agreement, report to the parties about such substantial compliance, and give advice and recommendations to the parties.

B. In carrying out their duties, consistent with legitimate requirements of security, the Monitors shall have the following:

1. unobstructed access to staff, inmates or other knowledgeable persons for interviews or written communication regarding conditions at the facilities covered by this Settlement Agreement. Such interviews or other communication may be held in private, and may be held in confidence by the Monitors. At their discretion, the Monitors may divulge the content or nature of such interviews or communications to the Director of the Department of Corrections and to Plaintiffs' Counsel and Defendants' Counsel;

2. complete and unobstructed access to relevant files, records, reports, memoranda or other documents within the defendants' possession or custody for purposes of measuring substantial compliance with the terms of this Settlement Agreement;

3. unobstructed access to tour and inspect the institutions.

C. The Monitors shall not be subject to dismissal except upon agreement of all parties or by the Court upon motion of one of the parties and upon a showing of good cause.

D. The reasonable costs of the Monitors shall be borne by the Department of Corrections.

E. In the event that either Dr. Lambert King and/or Robert Powitz resign, become incapacitated, or for any other reason cannot perform their duties, the parties will mutually select a substitute Monitor or Monitors.

VIII. MONITORING AND COMPLIANCE

A. In no event shall a determination of substantial compliance be made if exceptions to substantial compliance are the result of willful or intentional actions by defendants.

B. 1. Commencing on or about March 18, 1994, the Monitors shall conduct periodic inspections and prepare reports detailing the state of defendants' substantial compliance with the provisions of this Settlement Agreement. The Monitors shall complete their initial inspections and prepare their initial reports within three (3) months of their appointment. In the event that the three (3) month period is unfeasible due to scheduling problems, the time period for the Monitors to submit their reports may be extended by the agreement of the parties, but in no condition shall it be extended beyond six (6) months.

2. The periodic inspections of the Monitors shall continue until they notify defendants' counsel and plaintiffs' counsel that the defendants are in substantial compliance as defined in this Settlement Agreement.

C. Plaintiffs' Counsel will review the state of substantial compliance under Section VI, Management, Security and Inmate Activity within three (3) months of signing this Settlement Agreement, and resolve any compliance issues in these areas directly with the defendants.

D. Incidents of non-compliance do not necessarily prevent a finding of substantial compliance. The determination of substantial compliance shall take into account the extent to which exceptions to substantial compliance are sporadic or isolated in nature, are unintentional, are the temporary result of actions by the members of the plaintiff class and are promptly and properly addressed by corrective action.

E. This Settlement Agreement shall be submitted to the Court for its review and approval pursuant to Rule 23 of the Federal Rules of Civil Procedure. The parties shall recommend to the Court a method of complying with the notice provisions of Rule 23(d) and (e).

F. 1. The parties shall have the opportunity to challenge the determinations of the Monitors, pursuant to Section VIII, Paragraph B of this Settlement Agreement, and plaintiffs' counsel, pursuant to Section VIII, Paragraph C of this Settlement Agreement. The Court shall establish a procedure, if necessary, by which any hearing on that issue shall be conducted.

2. Upon review of the evidence, the Court will make a determination whether the defendants are in substantial compliance.

G. Upon receipt of the Monitors' reports of substantial compliance, the defendants shall file with the Court a motion to dismiss this lawsuit and dissolve any outstanding Decrees in Palmigiano v. Sundlun, except the provisions of Section III of this Settlement Agreement (Overcrowding Restrictions).

H. 1. For the first four (4) months following the Court's approval of a determination of substantial compliance, as set forth above, the defendants shall forward to plaintiffs' counsel monthly reports and supporting documentation detailing the status of defendants' compliance with Sections III, IV, V, and VI of the Settlement Agreement. The Director of the Department of Corrections shall serve on plaintiffs' counsel a certificate attesting that the contents of the reports are true and correct, and that the documents submitted in support of them are true and accurate copies of defendants' documents maintained in the ordinary course of operations of the Department.

2. The first such report shall be served on plaintiffs' counsel one (1) month from the date of the Court's approval of the substantial compliance determination.

3. The obligation to file monthly reports under this section of the Settlement Agreement shall conclude four months after the date on which the Court approves a determination of substantial compliance.

4. Plaintiffs' Counsel shall be afforded sufficient access to the institutions and to the plaintiffs to determine the accuracy of the representations contained in the reports served by defendants.

I. At the end of the four (4) month period set forth in Section VIII, Paragraph H and provided that the defendants demonstrate continuing substantial compliance, the parties, without

further recourse to judicial proceeding, including appellate review, shall execute and file a stipulation dismissing this lawsuit and dissolving any outstanding Decrees in Palmigiano v. Sundlun, except the provisions of Section III of this Settlement Agreement (Overcrowding Restrictions). The provisions of Section III of this Agreement shall survive the aforesaid dismissal and continue to be enforceable in accordance with the provisions of Section III, Paragraph G.

J. Nothing stated herein shall prevent plaintiffs from moving the Court for additional relief or further relief based upon a claim of non-compliance, including a failure to file appropriate monthly compliance reports and supporting documentation.

## IX. PERMANENT STATE PRISON OVERCROWDING CONTROL MECHANISM

A. One of the stated purposes of Executive Order No. 92-26 creating the Governor's Commission to Avoid Future Prison Overcrowding was to terminate federal court supervision over the ACI by having the Commission consider "the creation of a permanent body the purpose of which shall be to maintain the prison population within capacity on an ongoing basis."

B. The State of Rhode Island has created a permanent agency, body, commission or other mechanism (hereafter "State Mechanism") with the authority and power to control prison overcrowding. Accordingly, the parties agree that this case, specifically the

provisions of Section III (Overcrowding Restrictions), shall be retired and placed on inactive status in this Court provided that the following conditions are met:

1. The State Mechanism shall adopt the specific population capacities and restrictions set forth in Section III of this agreement as its own capacities and restrictions.

2. The State Mechanism shall have the authority and power under state law to enforce the aforesaid population capacities and restrictions effectively.

C. 1. The Department of Corrections shall provide to plaintiffs' counsel a quarterly report, in the format of the current "ACI Daily Population Report" form, detailing the actual population of each unit of each facility in the ACI on the last day of the quarter for a period of five (5) years after the Court enters the dismissal order, referred to in Section VIII, I, above.[10]

2. Each report shall include a signed certification by the Director of the Department of Corrections attesting to the fact that the aforesaid population capacities and restrictions are being adhered to.

---

[10] This 5-year limitation shall only apply to the defendants' obligation to provide quarterly population reports. It does not apply to the defendants' obligation to maintain the population capacities and restrictions referred to in Section III of the Settlement Agreement.

3. Plaintiffs waive any attorneys' fees and costs incurred by them for reviewing these quarterly reports, pursuant to Section IX, Paragraph C of this Settlement Agreement. No other fees or costs are waived in this agreement.

D. In the event that the population of any facility in the ACI exceeds the capacity limits of Section III for five (5) consecutive days in a non-emergency situation (Section III, Paragraph G), the Director shall notify plaintiffs' counsel of that fact in writing.

E. If the requirements and conditions set forth above in Section IX, Paragraphs A and B are being fully observed and the State Mechanism exercises its authority and power to enforce the population capacities and restrictions effectively, the provisions of Section III of this Settlement Agreement shall not be enforceable in this Court and plaintiffs agree not to bring any action or proceeding to enforce said provisions.

F. In the event that the State Mechanism is disbanded or discontinued, or loses its authority and power to enforce the aforesaid population capacities and restrictions effectively, or fails to exercise its authority and power to enforce the population capacities and restrictions effectively, the provisions of Paragraph E of this Section shall be null and void and plaintiffs shall have the right to seek enforcement of the provisions of Section III.

X. MISCELLANEOUS PROVISIONS

A. In entering into this Settlement Agreement, the defendants do not admit or concede that any rights of the plaintiffs under the Constitution or under the Decrees, are currently being violated at the ACI. Similarly, the plaintiffs do not make any concessions, now or in the future, with respect to inmate housing at the ACI except those expressly provided for in this Settlement Agreement. In addition, the plaintiffs and defendants are not waiving or relinquishing any rights that they may have under the Decrees unless expressly set forth in this Settlement Agreement.

B. The plaintiffs shall not seek additional relief in connection with this lawsuit except as expressly provided in this Settlement Agreement. This paragraph shall not preclude the plaintiffs from seeking to recover reasonable and necessary attorneys' fees, expenses, and costs incurred with negotiation or future enforcement of the Settlement Agreement.

C. This Settlement Agreement shall not be admissible in evidence in any proceeding or trial other than for the sole and limited purpose of enforcement of this Settlement Agreement. Rules 407 and 408 of the Federal Rules of Evidence are applicable to this Settlement Agreement.

D. The defendants shall notify all staff at the ACI facilities of the terms of the Settlement Agreement.

E. 1. If this Settlement Agreement is approved in its

entirety by the Court, then this Settlement Agreement and the Decrees of the Court constitute the entire agreement of the plaintiffs and defendants.

2. If this Settlement Agreement is not approved in its entirety by the Court, then this Settlement Agreement shall be null and void.

F. This Settlement Agreement is a document which all parties have negotiated and drafted. Since all parties participated equally in drafting its terms, the general rule of construction interpreting a document against the drafter shall not be applied in future interpretation of this Settlement Agreement.

G. The Settlement Agreement shall be effective on the date of its execution.

On Behalf of Plaintiffs

Alvin J. Bronstein, Esq.
Mark Lopez, Esq.
National Prison Project of the American Civil Liberties Union Fdn.
1875 Connecticut Ave, NW,
Ste. 410
Washington, D.C. 20009
(202) 234-4830

Date: March 18, 1994

On Behalf of Defendants

Bruce G. Sundlun
Governor, State of Rhode Island
State House
Providence, Rhode Island 02903

George A. Vose, Jr.
Director of the Department of Corrections
State of Rhode Island
40 Howard Avenue
Cranston, Rhode Island 02920
(401) 464-2611

Date: March 18, 1994

Respectfully submited,

Attorneys for Plaintiffs

Alvin J. Bronstein, Esq.
Mark Lopez, Esq.
National Prison Project of the
American Civil Liberties
Union Fdn.
1875 Connecticut Ave, NW,
Ste. 410
Washington, D.C. 20009

Attorneys for Defendants

Maureen G. Glynn
Special Assistant Attorney General
Robin E. Feder
Assistant Attorney General
72 Pine Street
Providence, Rhode Island
(401)274-4400 x2301

Elizabeth Murdock Myers
Executive Counsel to the
Governor Bruce G. Sundlun
State of Rhode Island
State House
Providence, Rhode Island

Anthony A. Cipriano
Associate Director and Chief
Legal Counsel
Ellen Evans Alexander
Deputy Chief Legal Counsel
Department of Corrections
75 Howard Avenue
Cranston, Rhode Island
(401) 464-2246

Date: March 18, 1994

Date: March 18, 1994

**3-4128** **Revised August 1991. Single cells are required for inmates assigned to maximum and close custody. All cells in which inmates are confined conform with the following requirements:**

1. **There must be 35 square feet of unencumbered space for the single cell occupant.**
2. **When confinement exceeds 10 hours per day, there is at least 80 square feet of total floor space for the occupant.**
3. **"Unencumbered space" is usable space that is not encumbered by furnishing or fixtures. At least one dimension of the unencumbered space is no less than seven feet. In determining unencumbered space, all fixtures must be in operational position and must provide the following minimum areas per person: bed, plumbing fixtures, desk, and locker.**
4. **Supervision is consistent with standard 3-4170.**

COMMENT: This standard encourages design flexibility and creativity by relating cell size to the amount of unencumbered or free space provided.

**3-4128-1** **Added August 1991. Single cells/rooms and multiple occupancy cells/rooms may be used for housing inmates in medium/minimum custody when the classification system, cell/room size, and level of supervision meet the following requirements:**

**1.**

| Number of Occupants | Amount of Unencumbered Space* |
|---|---|
| 1 | 35 square feet per occupant |
| 2–50 | 25 square feet** |

***"Unencumbered space" is usable space that is not encumbered by furnishings or fixtures. At least one dimension of the unencumbered space is no less than seven feet. In determining unencumbered space in the cell or room, the total square footage is obtained and the square footage of fixtures and equipment is subtracted. All fixtures and equipment must be in operational position and must provide the following minimums per person: bed, plumbing fixtures (if inside the cell/room), desk, locker, and chair or stool.**
****Sleeping area partitions are required if more than four people are housed in one sleeping area.**

2. **When confinement exceeds 10 hours per day, there is at least 80 square feet of total floor space per occupant.**
3. **Housing is in compliance with ACA standards 3-4132, 3-4133, 3-4134, 3-4137, 3-4144, and 3-4282.**
4. **Medium security inmates housed in multiple occupancy cells/rooms require direct supervision. (See glossary for definition of direct supervision.)**

**A classification system is used to divide the occupants into groups that reduce the probability of assault and disruptive behavior. At a minimum, the classification system evaluates the following:**

- **mental and emotional stability**
- **escape history**

**R. W. Powitz & Associates, P.C.**
P.O. Box 32365
Detroit, Michigan 48232-0365
(313) 972-4580

To: A. T. Wall, Esq., Assistant Director
Rhode Island Department of Corrections;
and
Mark J. Lopez, Esq., Staff Counsel
American Civil Liberties Union Foundation
National Prison Project

From: Robert W. Powitz, Ph.D., M.P.H.
Consulting Sanitarian

Subject: Environmental Health and Safety Evaluation of Rhode Island Department of Correction facilities: Intake Service Center; Special Needs Facility and Women's Facility

Date: March 12, 1992

On March 3rd and 4th, 1992, an environmental health and safety evaluation was made at the above named facilities within the State of Rhode Island institutional complex. This evaluation was conducted at the request of the State of Rhode Island and the ACLU National Prison Project. The purpose was to recommend the maximum inmate population carrying capacity of the facilities and make whatever comments on environmental health and safety as appropriate.

Accompanying this consultant during the tour were Mr. Kent Grissom, Sanitarian for the Rhode Island Department of Corrections and Mr. Mark Lopez, Staff Counsel for the ACLU National Prison Project. The writer would like to thank Mr. Grissom and the facility wardens for their cooperation, candor and kind hospitality.

The evaluation consisted of an on-site audit supported by non-destructive sampling of the environment to verify the findings. All sampling was conducted with pre-calibrated equipment in accordance with accepted protocols. The findings of the audit were compared against established standards: the American Correctional Association, Standards for Adult Correctional Institutions, 3rd Edition, and, the American Public Health Association, Standards for Health Services in Correctional Institutions, Second Edition. The standard which most closely reflected the prevailing conditions was used in determining population density. By enlarge, the recommendations reflected in this report were by consensus of all parties in the audit tour.

Appendix
B

The housing and support areas appeared to be well-maintained and clean. The food service facilities were in an exceptionally sanitary condition; all foods were adequately protected and proper temperatures were being maintained.

Many areas surveyed as part of this audit were scheduled to undergo renovations. Therefore, the recommendations which follow are based upon analogous conditions and a plan review. It is recommended that the facilities be reevaluated after all modifications have been completed.

**Intake Service Center:**

The South side of the Intake Service Center has a capacity of 168 inmates and a current population of 130. There are eight Pennsylvania styled modules: six having 24 cells each in a bi-level configuration, and two have 12 cells each. The facility was originally designed for single cell occupancy with adequate accompanying day space of approximately 35 ft.sq. per inmate. A typical cell has approximately 70 ft.sq. of which 44 ft.sq. are unencumbered. The ventilation system provides an adequate amount of air to the cell although the amount of fresh air makeup could not be determined. The cells themselves are positive pressured relative to the day space area. The cell exhaust intake is positioned approximately two feet from the air supply. As a result, there is poor air circulation within the cells. This was verified by a smoke tube test. The temperatures were well within the comfort range. However, the relative humidity was measured at 17%, which is considered low; apparently there is no humidification in the ventilation system. Desk and day room lighting was below acceptable standards. The plumbing system however, was well maintained and adequate.

Reportedly, out of cell activity is approximately five hours per day with 1.5 hours as yard time every other day. Each level of the modules share the day space during the ten hour activity period. When inmates are in the day room, their cells are locked and unavailable as toilet facilities. There are two toilets and two urinals serving the day room area. Showers adjoin the day room toilets and access to them is not restricted.

The on-site laundry facilities are well-designed and adequate to meet most of the laundry needs of the facility. Inmates do not launder their own personal garments within their cells and there was no evidence of soiled linens, beds or bedding. Personal hygiene supplies are in adequate supply and readily available to the inmates. Smoking is not restricted and there are no cells designated for non-smokers.

The infirmary (which will undergo major renovation) was crowded, with beds less than six feet apart and total individual space less than 45 ft.sq. per inmate. The room is poorly ventilated; air circulation was barely detectable and smoking was not restricted for the comfort of those inmates with respiratory disease.

The toilets and showers are not accessible for handicapped or infirm inmates; there are no grab bars or nurses' call button. Bed heights were not adjusted and there is no infection control program.

The isolation rooms are positively pressured. The flow of air is from the room to the corridor. There is no protection of uninfected individuals in the vent of an isolation for a communicable respiratory disease. There was a Psorid fly infestation within the room originating from the shower drains.

The intake and committing area is small and the housekeeping was not at the quality which has been established throughout the facility.

Feeding of the inmates is centralized. The kitchen and dining room facilities were extremely clean and well maintained. There was no evidence of vermin, the food temperatures were safe and food protection was exceptional. Tray preparation was in less than 20 seconds in a continuous operation.

Although the kitchen has the potential for safely preparing and serving approximately 2800 meals per day, there are significant limitation is space, lack of make up air in the kitchen and poor exhaust ventilation in the dish washing room. Space in the kitchen and serving lines are limited. Only one serving line was in operation at the time of this audit. The inmate workers were somewhat crowded and space was limited in moving heavy and hot objects. There is inadequate makeup air in the kitchen. The canopy hoods over the food preparation islands cannot be turned on during food serving activities. A negative draft is created within the kitchen bringing in air through the serving doors. The flow therefore, is from soiled to clean. The ventilation in the dish washing room is poor. Condensate is not removed due to the excessive static pressure losses caused by the duct configuration which serves the dishwasher.

Recommendation:

It is my recommendation that the Intake Service Center South, remain single celled and that a population greater than 168 is unacceptable due to the inadequate environmental conditions. The limiting factors include: less than 35 ft.sq. of unencumbered space within the cells and day rooms and the lack of adequate air circulation in the housing areas. In addition, there are only two toilet hoppers available to each module day room. This results in a ratio of 1 toilet to 24 inmates in the day room space. The lack of adequate physical space and poor ventilation in both the infirmary and kitchen limit the amount of activity in each area.

It is my understanding that a compromise position of 250 inmates has been offered. This would increase the density in the day rooms to 36 inmates and reduce unencumbered space in cells to less than 15 ft.sq.. I find this acceptable only if the following conditions are modified and the proposed remodeling completed.

However, I should emphasize that under no circumstances are the facilities capable of safely housing a population of 336.

Here are the minimum requirements to begin double celling:

1. Optimize in-cell ventilation by redesigning the air intake and exhaust vent grilles. Replace the perforated plates covering the intake and exhaust vents with a secure hardware cloth. This will reduce the static pressure losses and permit greater air turnover within the cells. An air deflector should be installed on the air intake vent to direct the flow to the back of the cell and thereby increasing circulation.
In addition, humidification must be provided in the air makeup system and the day room exhaust needs to be enhanced to remove smoke and body odors.

2. Out of cell activities should be increased to a minimum of ten hours per day. Although this would limit personal unencumbered space within the day rooms, the out of cell activities would offset the more crowded conditions if the cells were left unlocked. By doing this, additional toilet facilities would not be needed. However, if the cells were to remain locked during out of cell time, additional sanitary facilities must be provided by converting two cells on base tier for toilet use, or installing two additional toilets in an area suitable for surveillance.

3. Since the unencumbered space within the cells will be less than 15 ft.sq., during double cell occupancy, the need to enhance in-cell conditions becomes essential. Only one inmate at a time will have access to the desk and even the floor; the other inmate will have to use his bed. Therefore, additional lighting needs to be provided so that reading materials can be seen without strain at the bunks.

4. Provide for adequate make-up air within the kitchen facility so that preparation can be carried out during serving times. The ventilation in the dish washing room needs to be modified or improved to remove condensate from the dish washing operation.

5. Make immediate modifications in the infirmary to prevent secondary spread of infectious diseases. Particular attention should be placed on current inmate density and on the establishment of a comprehensive infection control program.

**Special Needs Facility:**

The Special Needs Facility has a capacity of 250. On the day of this evaluation, the population was 238. Reportedly, there will be significant modifications made to the ventilation system and toilet areas; some modifications are also scheduled for the kitchen.

A basement recreation and industries area will be converted into a dormitory similar in size to those in the rest of the facility.

Currently, the ventilation is largely passive. Window area exceeds standards except at the facilities lying below grade, lighting is adequate and the facility was very clean and well maintained. Temperatures and humidity levels were within the comfort range. The kitchen, although old, has ample space and is in a sanitary condition and well maintained. Feeding is centralized.

The dormitory toilets were clean, well lighted and maintained. However, the ratio of showers to inmates in dormitories A, B and C, are below the older standards of 1:15. Additionally, there is a problem with condensate removal; particularly in Dorm A. The shower area is in a cul-du-sac and has no exhaust ventilation. This has resulted in spalling tiles and peeling paint.

Recommendations:

When construction on the basement dormitory has been completed; Dorm D toilets renovated; eight additional showers are provided in dorms A, B and C; toilets and showers are installed in A Honor Dorm; and, adequate toilet facilities and ventilation installed in Dorm E, the capacity of this facility can be 324. viz.:

Dormitory A, B, C and F: 54 inmates each;
Dormitory D: 32 inmates;
Dormitory AH: 20 inmates;
Cell Block DCB: 16 inmates;
Cell Block CBS: 20 inmates, and
Dormitory E: 20 inmates.

**Women's Facility:**

The Women's Facility has a current capacity of 110. At the time of this evaluation, the count was 98 and there were 180 beds within the facility. The kitchen feeds approximately 200 inmates per meal. Although the kitchen is old, paint is peeling, and the storage space is inadequate, the overall sanitation was exceptionally good. It is understood that this facility will undergo remodeling and several pieces on new equipment will be installed at that time.

The inmate housing has no ventilation system. The air exchange is passive, heat cannot be regulated (temperatures in excess of 85 degrees with relative humidity of 7% were measured). There are no toilets in the sleeping rooms. The correctional officers open the doors upon request or provide for toilet access once an hour during lockdown and sleep hours. The toilet in D wing has a leak in the ceiling and the finish on the lavatory island has been damaged from chronic wetness.

Recommendation:

Under present conditions the capacity of the building (110 inmates) should not be exceeded. The limiting factors include the lack of ventilation throughout the building, the space limitation in the kitchen and the below standard ratio of toilet and personal hygiene facilities per inmate.

I believe that the capacity of the building can be raised to 125 when the following modifications and reconstruction is completed. The additional carrying capacity can be absorbed in the 17 larger dormitory rooms. These rooms currently have a capacity for four inmates each. However, the space standards would not be compromised if a fifth inmate were to be placed in these rooms.

To safely house the any inmates within the building, the following recommendations are offered:

1. The inmates should have free access to the toilets at all times. The configuration of the wings will permit adequate surveillance to monitor movement during the evening and night shifts.

2. Exhaust fans should be immediately installed to help modulate temperatures and remove smoke and odors from the sleeping rooms. Since the ventilation is only passive, a number of sleeping rooms should be designated as smoke free for non-smoking inmates.

A study to install a building-wide ventilation system should be undertaken and completed within a time-frame acceptable to all parties.

3. The toilet areas need to be repaired and exhaust ventilation installed within the shower rooms. The floor finish within the shower room in the segregation wing needs to be improved so that it can be effectively cleaned and sanitized.

4. Where security is not an issue, the dorm rooms should have a table and chairs so that inmates can write letters and engage in quiet activities during in cell times.

**General Recommendations:**

Although the fire drills and evacuation procedures are well documented and follow a rigid schedule, there are several conditions throughout the facilities which pose a fire hazard; emergency egress is of particular concern. For instance, stairwell doors were propped open and room egress blocked by desks and chairs; ease of egress was also restricted in some of the domicile areas. It is strongly suggested that a full-time fire marshall be hired for the complex. This individual can monitor fire loading and review remodeling plans for compliance with Life Safety Code 101.

A study should be undertaken to review cleaning products used for general sanitation particularly in the food preparation areas. Phenolic disinfectants are both toxic and polluting and should be replaced with a tuberculocidal quaternary detergent/disinfectant. Several products do not appear to be compatible with one another

Abrasive cleansers, when used on vitreous china will abrade the surface. Once scored, it provides harborage for bacterial growth, formation of mineral crystals and organic stain. Additional safe cleaning compounds are needed for effective cleaning. By standardizing cleaning materials, overall sanitation and safety can be further improved, cost can be minimized, finishes protected, and pollution abated.

Please call me if clarification on any of the recommendations is necessary or if I might be of further service to you.

Respectfully submitted,

Robert W. Powitz, Ph.D., M.P.H.
Consulting Sanitarian

0055c/54

RECEIVED

DEC 7 1994

CLERK
U. S. DISTRICT COURT
DISTRICT OF R. I.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NICHOLAS A. PALMIGIANO, et al.<br>v.<br>BRUCE G. SUNDLUN, et al. | C.A. No. 74-0172 L |
| THOMAS R. ROSS, et al.<br>v.<br>BRUCE G. SUNDLUN, et al. | C.A. No. 75-0032 |

ORDER

The parties joint Motion for Determination of Compliance was heard before Judge Ronald R. Lagueux on December 6, 1994. It is

ORDERED, ADJUDGED AND DECREED

that the parties Motion for Determination of Compliance is hereby granted.

ENTER

Ronald R. Lagueux
C.J. 12/7/94

PER ORDER

[signature]

Prepared by:

[signature]

Maureen G. Glynn (#3800)
Special Assistant
Attorney General
72 Pine Street
Providence, RI 02903
(401) 274-4400